**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
1160 Battery Street East
Suite 100 - #3425
San Francisco, CA 94111
Telephone: (415) 373-1671
Facsimile: (415) 484-1294
Email: aapton@zlk.com

**BRAGAR EAGEL & SQUIRE, P.C.**
Melissa A. Fortunato (SBN 319767)
580 California Street, Suite 1200
San Francisco, CA 94104
Telephone: (415) 568-2124
Facsimile: (212) 214-0506
Email: fortunato@bespc.com

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiffs*

*[Additional Counsel on Signature Page]*

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JEFFREY EDELMAN, JAYSEN STEVENSON, and CHRISTIAN JACOBSEN, Derivatively on Behalf of CareDx, Inc.,<br><br>Plaintiffs,<br><br>v.<br><br>GEORGE BICKERSTAFF, FRED COHEN, CHRISTINE COURNOYER, GRACE E. COLÓN, ANKUR DHINGRA, MICHAEL D. GOLDBERG, WILLIAM HAGSTROM, PETER MAAG, REGINALD SEETO, RALPH SNYDERMAN, ARTHUR A. TORRES, and HANNAH VALANTINE,<br><br>Individual Defendants,<br><br>-and-<br><br>CAREDX, INC.,<br><br>Nominal Defendant. | Case No.<br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |

Plaintiffs Jeffrey Edelman, Jaysen Stevenson, and Christian Jacobsen (collectively, "Plaintiffs"), by and through their undersigned attorneys, derivatively on behalf of nominal defendant CareDx, Inc. ("CareDx" or the Company"), bring this derivative action against individual defendants George Bickerstaff ("Bickerstaff"), Fred Cohen ("Cohen"), Christine Cournoyer ("Cournoyer"), Grace E. Colón ("Colón"), Ankur Dhingra ("Dhingra"), Michael D. Goldberg ("Goldberg"), William Hagstrom ("Hagstrom"), Peter Maag ("Maag"), Reginald Seeto ("Seeto"), Ralph Snyderman ("Snyderman"), Arthur A. Torres ("Torres"), and Hannah Valantine ("Valantine") (collectively, the "Individual Defendants," and together with CareDx, the "Defendants") for breaches of fiduciary duties as directors and/or officers of CareDx and for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

Plaintiffs allege the following based upon personal knowledge as to Plaintiffs and their own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by Plaintiffs' attorneys, which included, among other things, a review of documents produced by Defendants pursuant to 8 *Del. C.* § 220 ("Section 220"), as well as a review of the Defendants' public documents, conference call transcripts, United States Securities and Exchange Commission ("SEC") filings, wire and press releases, legal filings, news reports, securities analysts' reports and advisories about the Company, and other publicly available sources.

## NATURE OF THE ACTION

1. This is a stockholder derivative action, brought against certain current and former CareDx officers and members of the CareDx Board of Directors (the "Board"), seeking to remedy

wrongdoing committed by the Individual Defendants between April 30, 2020, and November 3, 2022, inclusive (the "Relevant Period").

2. CareDx is a diagnostics company that provides services and products to the organ transplant recipient community, offering diagnostic testing services, products, and digital healthcare software for transplant patients and care providers. The information gathered through the Company's surveillance testing – by which it routinely tested patients with no medical necessity – purportedly enables clinicians to detect warning signs of organ transplant rejection in transplant recipients.

3. CareDx's most lucrative testing product was AlloSure® Kidney ("AlloSure Kidney"), a donor-derived cell-free DNA ("dd-cfDNA") blood test designed to detect whether a patient would reject a kidney after a transplant. Medicare reimbursed CareDx for the Company's AlloSure Kidney test at a lucrative rate of $2,841 per test compared to just $22 for a routine, "standard of care" blood test for post-operative kidney patients. Medicare's regulations dictated that it could only reimburse CareDx for medically necessary tests – meaning that, in the case of AlloSure Kidney, only patients who had already shown "clinical suspicion of rejection" (*i.e.*, had shown other warning signs of organ transplant rejection) were eligible for testing.

4. For testing services, the Company receives a higher payment from Medicare reimbursements than from commercial payers. Therefore, the number of tests for which the Company was able to receive Medicare reimbursement correlated with the Company's comparably higher average sales price ("ASP") for testing services. The Company did not specifically report ASP in its public disclosures, but investors were able to calculate it by dividing testing service revenue by the number or volume of reported tests per financial period.

5. In early 2020, the COVID-19 pandemic resulted in many transplant patients opting to stay home and avoid medical facilities. In response, CareDx launched RemoTraC, a home testing and mobile phlebotomy program. CareDx's RemoTraC program sent third-party "mobile phlebotomists" to patients' homes to draw blood. The samples were then tested at a CareDx facility. By mid-2020, RemoTraC accounted for 50% of the Company's testing services business.

6. As COVID-19 concerns became less pronounced, Defendant Seeto, the Company's Chief Executive Officer ("CEO"), emphasized to investors that RemoTraC's success would not be temporary, claiming that RemoTraC served an "unmet need" among patients.

7. In February 2021, the Company reported a 51% year-over-year increase in total revenue. Testing services revenue in particular saw a material increase from $104.6 million in 2019 to $163.5 million in 2020, a 56% year-over-year increase. Defendant Seeto informed the public that the Company "should be focused" on the testing services segment. The Individual Defendants presented the testing services segment as the Company's growth driver and Seeto described the Company's testing services segment as having "a winning formula" that would allow the Company to capture a massive total addressable market ("TAM").

8. During the Relevant Period, the Individual Defendants caused the Company to issue materially false and misleading statements regarding testing services. Specifically, the Individual Defendants failed to disclose that certain CareDx officers had engaged in a number of improper and illegal schemes to inflate testing services revenue, including: (i) pushing protocols for surveillance of organ rejection through inaccurate marketing materials in violation of Medicare standards; (ii) offering extravagant inducements or kickbacks to physicians and other providers; and (iii) improperly bundling expensive testing services with other blood tests as part of the RemoTraC service. As a result of this misconduct, CareDx would be subject to an

undisclosed risk of regulatory scrutiny and the Company's testing services revenue and demand reported throughout the Relevant Period was artificially inflated. Due to the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading and/or omitted material facts necessary to make those statements not false and misleading.

9. On October 28, 2021, the truth began to emerge when CareDx filed its quarterly report for the third quarter of 2021. Under the heading "United States Department of Justice and United States Securities and Exchange Commission Investigation," the Company revealed for the first time that CareDx was the subject of at least three government investigations. Specifically, the Company had received: (1) a civil investigative demand ("CID") from the U.S. Department of Justice ("DOJ") requesting the Company produce documents in connection with the DOJ's False Claims Act investigation; (2) a subpoena from the SEC "in respect of matters similar to those identified in the CID, as well as certain of our accounting and public reporting practices"; and (3) an information request from an unnamed state regulatory agency (collectively, the "Government Investigations").

10. On this news, the Company's stock price declined from $70.34 per share on October 28, 2021, to $51 per share on October 29, 2021. The stock continued to decline over the next week, declining to $47.04 per share on November 5, 2021. This represented a 33% decline from the closing price on October 28, 2021.

11. The Company did not further comment on the status of the Government Investigations for several months. But investors learned more about the extent of the Individual Defendants' misconduct and the nature of the Government Investigations on April 15, 2022, when Dr. Michael Olymbios, a medical doctor and the Company's former Head of Community

Nephrology, filed a complaint against CareDx in California Superior Court (the "Olymbios Complaint"), which provided details regarding: (1) misconduct on the part of Defendants Seeto and Maag, including the use of RemoTraC to improperly bundle the Company's most expensive testing services, including AlloSure Kidney, with other blood tests, that led to the Government Investigations; (2) Defendants Seeto's and Maag's knowledge of the misconduct throughout the Relevant Period; and (3) attempts by Defendants Maag and Seeto to conceal the misconduct.

12. On this news, the Company's stock price fell to $35.41 per share on April 14, 2022, and continued to fall the next trading day to $32.55 per share, a decrease of more than 14% from the closing price of $38.02 on April 13, 2022.

13. On May 5, 2022, the Company announced its financial results for the first quarter of 2022, reporting that testing service revenue fell well short of analysts' expectations and disclosing a 4.9% decline in ASP versus the last quarter of 2021.

14. On this news, the Company's stock price fell to $25.78 on May 6, 2022, and continued to fall the following trading day to $22.46, a 29% drop from the closing price of $31.66 on May 5, 2022.

15. On May 23, 2022, the Company announced that Defendant Dhingra, the Company's Chief Financial Officer ("CFO"), resigned from CareDx effective immediately. Defendant Dhingra had started with the Company only 14 months prior.

16. On the news of Defendant Dhingra's resignation, the Company's stock price fell 7.5%, from a close of $25.86 per share on May 20, 2022, to a close of $23.92 on May 23, 2022.

17. Then, on November 3, 2022, the Company filed its quarterly report for the third quarter of 2022 (the "3Q 2022 10-Q"). The 3Q 2022 10-Q disclosed a steep decline in CareDx's ASP per test, as well as a 9% decrease in Medicare revenue. Significantly, CareDx finally

revealed that the reason its ASP was declining so precipitously was not because its test pricing had decreased, but because CareDx was going entirely unreimbursed for an enormous and growing number of its tests.

18. On this news, CareDx's stock price fell from a close of $18.73 per share on November 3, 2022, to $16.02 per share on November 4, 2022 – a decline of more than 14% – on unusually high trading volume.

19. During an investor conference call on November 15, 2022, the truth regarding the Individual Defendants' misconduct was finally revealed in full when the Company's new CFO, Abishek Jain ("Jain"), revealed that as many as 50% of the Company's tests administered and submitted for payment were being rejected for any reimbursement at all. In other words, one out of two tests CareDx was administering was deemed medically unnecessary.

20. In light of the Individual Defendants' misconduct, the Company, as well as Defendants Seeto, Dhingra, and Maag, were named as defendants in a federal securities class action in the Northern District of California captioned *Plumbers & Pipefitters Local Union #295 Pension Fund v. CareDx, Inc., et al.*, Case No. 3:22-cv-03023-TLT (the "Federal Securities Class Action").

21. In addition to exposing the Company to massive, class-wide liability, the Federal Securities Class Action, other lawsuits, and governmental investigations highlighted the need for CareDx to implement adequate internal controls.

**JURISDICTION AND VENUE**

22. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and Section 20(a) of the

Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1). This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a). The Company does not have a forum selection clause.

23. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that would not otherwise have such jurisdiction.

24. Venue is proper in this District because the Company is headquartered in this District and the Individual Defendants have been involved in business in this District. Further, Defendants' actions have had an effect in this district.

**RELEVANT PROCEDURAL HISTORY**

25. On September 21, 2022, plaintiff Edelman filed a Verified Stockholder Derivative Complaint in the Northern District of California in connection with the Individual Defendants' misconduct alleged herein, captioned *Edelman v. Goldberg et al.*, Case No. 3:22-cv-5379. Within days, Dr. Olymbios contacted plaintiff Edelman's counsel and confirmed that plaintiff Edelman's complaint – upon which this complaint is based in part – "very accurately describes the disregard management had for anything other than their own fortunes [and how] they waste resources of the company for their own benefit." A copy of Dr. Olymbios' correspondence is reproduced below:

**From:** Michael [redacted]
**Sent:** Sunday, September 25, 2022 9:27 AM
**To:** Gregory Nespole <gnespole@zlk.com>
**Subject:** [External]Case No. 3:22-cv-5379

Dear Mr. Nespole,

I am writing to you with great interest in your recently filed lawsuit against CareDx. I am the former employee of CareDx, Michael Olymbios, whom you reference in the complaint.

Although it is unfortunate that shareholders have had to suffer, I am glad that they are taking action against the crooks who ran and run that company.

Your complaint very accurately describes the disregard management had for anything other than their own fortunes. How they waste resources of the company for their own benefit. I am a prime example of that where Reg Seeto is enacting a personal vendetta against me while spending millions of dollars of company money on legal fees to Paul Hastings. That's just the tip of the iceberg.

I would be willing to assist you maximally with your case and I hope that justice can be done. I would be happy to speak with your client if he is open to it.

With best regards,
Michael Olymbios

[redacted]

26. On November 28, 2022, plaintiffs in the Federal Securities Class Action filed an amended complaint (the "First Amended Class Action Complaint") containing statements from confidential witnesses that were employed by CareDx during the Relevant Period. *See* Federal Securities Class Action, ECF No. 53.

27. On February 7, 2023, plaintiff Stevenson filed a Verified Stockholder Derivative Complaint in the Northern District of California in connection with the Individual Defendants' misconduct alleged herein, captioned *Stevenson v. Bickerstaff et al.*, Case No. 3:23-cv-00557.

28. On March 9, 2023, the Court issued an Order consolidating the *Edelman* and *Stevenson* actions (the "Consolidation Order," *Edelman*, ECF No. 26) styled *In re CareDx, Inc. Derivative Litigation* under the *Edelman* case number (the "Consolidated Derivative Action").

29. On May 24, 2023, the Court issued an order in the Federal Securities Class Action granting the defendants' motion to dismiss the First Amended Class Action Complaint with leave to amend. Federal Securities Class Action, ECF No. 75.

30. On June 28, 2023, plaintiffs in the Federal Securities Class Action filed a second amended complaint (the "Second Amended Class Action Complaint") containing many of the same statements by the same confidential witnesses as in the First Amended Class Action Complaint. Federal Securities Class Action, ECF No. 81.

31. On February 8, 2024, plaintiff Jacobsen filed a Verified Stockholder Derivative Complaint in the Northern District of California in connection with the Individual Defendants' misconduct alleged herein, captioned *Jacobsen v. Bickerstaff et al.*, Case No. 3:24-cv- 00776. Pursuant to the Consolidation Order, the *Jacobsen* action was consolidated with and into the Consolidated Derivative Action.

32. On July 1, 2024, Plaintiffs filed a Verified Consolidated Amended Stockholder Derivative Complaint. Consolidated Derivative Action, ECF No. 57.

33. On July 15, 2024, the Court issued an order denying Plaintiffs' administrative motion to seal the foregoing pleading. *Id.*, ECF No. 60.

34. On September 18, 2024, the Court issued an Order in the Federal Securities Class Action granting in part and denying in part the defendants' motion to dismiss the Second Amended Class Action Complaint, with leave to further amend. Federal Securities Class Action, ECF No. 123. Specifically, in relevant part, the Court denied the defendants' motion to dismiss regarding statements concerning underwriting representations and statements regarding testing services revenue and historical RemoTraC data. *Id.* at 43.

35. On October 18, 2024, plaintiffs in the Federal Securities Class Action filed a third amended complaint (the "Third Amended Class Action Complaint") containing many of the same statements by the same confidential witnesses as in the First Amended Class Action Complaint

and Second Amended Class Action Complaint. Federal Securities Class Action, ECF No. 133 (as corrected).

36. On November 4, 2024, Plaintiffs and Defendants entered into a letter agreement (the "Letter Agreement") providing, in relevant part, that: (i) Plaintiffs would agree to dismiss the Consolidated Derivative Action without prejudice; (ii) Plaintiffs could re-file the Consolidated Derivative Action in the event that the Court denied any part of the defendants' motion in the Federal Securities Class Action to dismiss the Third Amended Class Action Complaint; (iii) all applicable statutes of limitations and/or repose are deemed to have been tolled with respect to the re-filed derivative action; and (iv) for purposes of pleading demand futility pursuant to Fed. R. Civ. P. 23.1 in the re-filed derivative action, the Company's Board shall be deemed to be the Board as of September 21, 2022.

37. On November 7, 2024, the Court issued an order dismissing the Consolidated Derivative Action without prejudice pursuant to the parties' stipulation. Consolidated Derivative Action, ECF No. 72.

38. On February 18, 2025, the Court issued an order in the Federal Securities Class Action denying the defendants' motion to dismiss the Third Amended Class Action Complaint. Federal Securities Class Action, ECF No. 154. Specifically, in relevant part, the Court found that the Federal Securities Class Action plaintiffs adequately pled that the defendants' statements as to the Company's compliance with 42 U.S.C. §1395nn ("Limitation on certain physician referrals") (the "Stark Law") were materially false and misleading and that the Federal Securities Class Action plaintiffs adequately pled the defendants' scienter based on a holistic review of their allegations. Federal Securities Class Action, ECF No. 154 at 18, 26-27.

39. Pursuant to the terms of the Letter Agreement, Plaintiffs timely notified Defendants of their intention to re-file the Consolidated Derivative Action and filed this Complaint.

## PARTIES

***Plaintiffs***

40. Plaintiff Jeffrey Edelman is, and has continuously been, a stockholder of CareDx during the wrongdoing complained of herein.

41. Plaintiff Jaysen Stevenson is, and has continuously been, a stockholder of CareDx during the wrongdoing complained of herein.

42. Plaintiff Christian Jacobsen is, and has continuously been, a stockholder of CareDx during the wrongdoing complained of herein.

***Nominal Defendant***

43. Nominal Defendant CareDx is a Delaware corporation with its principal executive offices located at 8000 Marina Boulevard, 4th Floor, Brisbane, California 94005. CareDx's shares trade on the NASDAQ exchange under the symbol "CDNA."

***Director Defendants***

44. Defendant Seeto served as CEO and a director of the Company beginning in November 2020 and as President beginning in November 2018. He resigned as CEO, President, and director effective November 1, 2023. In connection with his resignation, Defendant Seeto transitioned to the role of Senior Advisor to the Chairperson. During the Relevant Period, the Company paid Defendant Seeto total compensation of approximately $25,495,089. According to the proxy statement filed on schedule 14A with the SEC on April 29, 2024 (the "2024 Proxy Statement"), in 2023, Defendant Seeto received a base salary of $620,000 from the Company. As

of March 31, 2024, Defendant Seeto beneficially owned 543,799 shares of the Company's common stock. At the close of trading on March 28, 2024, CareDx's stock traded at $10.59 per share. Defendant Seeto's holdings thus amounted to approximately $5,758,831.41 worth of CareDx stock.

45. Defendant Bickerstaff has served as a Company director since April 2014. Defendant Bickerstaff serves as a member of both the Audit and Finance Committee and the Governance and Nominating Committee. During the Relevant Period, the Company paid Defendant Bickerstaff total fees of approximately $892,005. According to the 2024 Proxy Statement, in 2023, Defendant Bickerstaff received $368,743 in total compensation from the Company. As of March 31, 2024, Defendant Bickerstaff owned 188,321 shares of the Company's common stock. At the close of trading on March 28, 2024, CareDx's stock traded at $10.59 per share. Defendant Bickerstaff's holdings thus amounted to approximately $1,994,319.39 worth of CareDx stock.

46. Defendant Cohen has served as a Company director since 2003. Defendant Cohen serves as a member of both the Compensation and Human Capital Committee and the Science and Technology Committee. During the Relevant Period, the Company paid Defendant Cohen total fees of approximately $863,943. According to the 2024 Proxy Statement, in 2023, Defendant Cohen received $355,858 in total compensation from the Company. As of March 31, 2024, Defendant Cohen beneficially owned 221,192 shares of the Company's common stock. At the close of trading on March 28, 2024, CareDx's stock traded at $10.59 per share. Defendant Cohen's holdings thus amounted to approximately $2,342,423.28 worth of CareDx stock.

47. Defendant Cournoyer has served as a Company director since 2019. Defendant Cournoyer serves as a member of both the Audit and Finance Committee and the Science and

Technology Committee, as well as Chair of the Compensation and Human Capital Committee. During the Relevant Period, the Company paid Defendant Cournoyer total fees of approximately $862,364. According to the 2024 Proxy Statement, in 2023, Defendant Cournoyer received $384,446 in total compensation from the Company. As of March 31, 2024, Defendant Cournoyer beneficially owned 75,735 shares of the Company's common stock. At the close of trading on March 28, 2024, CareDx's stock traded at $10.59 per share. Defendant Cournoyer's holdings thus amounted to approximately $802,033.65 worth of CareDx stock.

48. Defendant Colón served as a Company Director from 2019 until June 2024. Defendant Colón served as Chair of the Science and Technology Committee and as a member of the Compensation and Human Capital Committee. During the Relevant Period, the Company paid Defendant Colón total fees of approximately $870,191. According to the 2024 Proxy Statement, in 2023, Defendant Colón received $360,868 in total compensation from the Company. As of March 31, 2024, Defendant Colón beneficially owned 52,536 shares of the Company's common stock. At the close of trading on March 28, 2024, CareDx's stock traded at $10.59 per share. Defendant Colón's holdings thus amounted to approximately $556,356.24 worth of CareDx stock.

49. Defendant Goldberg has served as a Company director since November 2011 and as the Chairman of the Board since November 2021. Defendant Goldberg serves as a member of the Audit and Finance Committee, the Governance and Nominating Committee, and the Compensation and Human Capital Committee. During the Relevant Period, the Company paid Defendant Goldberg total fees of approximately $1,129,028. According to the 2024 Proxy Statement, in 2023, Defendant Goldberg received $456,025 in total compensation from the Company. As of March 31, 2024, Defendant Goldberg beneficially owned 286,750 shares of the

Company's common stock. At the close of trading on March 28, 2024, CareDx's stock traded at $10.59 per share. Defendant Goldberg's holdings thus amounted to approximately $3,036,682.50 worth of CareDx stock.

50. Defendant Hagstrom has served as a Company director since 2015. Defendant Hagstrom serves as a member of both the Audit and Finance Committee and the Compensation and Human Capital Committee. During the Relevant Period, the Company paid Defendant Hagstrom total fees of approximately $862,691. According to the 2024 Proxy Statement, in 2023, Defendant Hagstrom received $360,868 in total compensation from the Company. As of March 31, 2024, Defendant Hagstrom beneficially owned 131,023 shares of the Company's common stock. At the close of trading on March 28, 2024, CareDx's stock traded at $10.59 per share. Defendant Hagstrom's holdings thus amounted to approximately $1,387,533.57 worth of CareDx stock.

51. Defendant Maag has served as a Company director since 2012. Defendant Maag served as the Company's CEO from October 2012 until November 2020 and as President from October 2012 through November 2018. During the Relevant Period, the Company paid Defendant Maag $6,400,015 as compensation for his service as CEO and total fees for his service as a director in the amount of approximately $299,597. According to the 2024 Proxy Statement, in 2023, Defendant Maag received $354,928 in total compensation from the Company. As of March 31, 2024, Defendant Maag beneficially owned 1,253,313 shares of the Company's common stock. At the close of trading on March 28, 2024, CareDx's stock traded at $10.59 per share. Defendant Maag's holdings thus amounted to approximately $13,272,584.70 worth of CareDx stock.

52. Defendant Snyderman served as a Company director from November 2005 through December 2022. During the Relevant Period, the Company paid Defendant Snyderman

total fees of approximately $860,873. According to the proxy statement filed on schedule 14A with the SEC on April 28, 2023 (the "2023 Proxy Statement"), in 2022, Defendant Snyderman received $317,544 in total compensation from the Company. As of May 2, 2022, Defendant Snyderman owned 151,397 shares of the Company's common stock. At the close of trading on May 2, 2022, CareDx's stock price was $32.57. Thus, Defendant Snyderman owned approximately $4,931,000.29 worth of CareDx stock.

53. Defendant Valantine has served as a Company director since 2021. During the Relevant Period, the Company paid Defendant Valantine total fees of approximately $625,534. According to the 2024 Proxy Statement, in 2023, Defendant Valantine received $353,743 in total compensation from the Company. As of March 31, 2024, Defendant Valantine beneficially owned 43,357 shares of the Company's common stock. At the close of trading on March 28, 2024, CareDx's stock traded at $10.59 per share. Defendant Valantine's holdings thus amounted to approximately $359,150.63 worth of CareDx stock.

54. Defendant Torres has served as a Company director since 2021. Defendant Torres serves as the Chair of the Governance and Nominating Committee. During the Relevant Period, the Company paid Defendant Torres total fees of approximately $634,264. According to the 2024 Proxy Statement, in 2023, Defendant Torres received $353,743 in total compensation from the Company. As of March 31, 2024, Defendant Torres beneficially owned 43,284 shares of the Company's common stock. At the close of trading on March 28, 2024, CareDx's stock traded at $10.59 per share. Defendant Torres's holdings thus amounted to approximately $458,377.56 worth of CareDx stock.

55. Collectively, Defendants Goldberg, Bickerstaff, Cournoyer, and Hagstrom, are referred to herein as the "Audit Committee Defendants."

***Officer Defendant***

56. Defendant Dhingra served as the Company's CFO from March 15, 2021, until his resignation effective May 25, 2022. During the Relevant Period, the Company paid Defendant Dhingra approximately $5,653,037. Moreover, as of May 2, 2022, Defendant Dhingra beneficially owned 41,896 shares of the Company's common stock. At the close of trading on May 2, 2022, the price of CareDx stock was $32.57. Thus, Defendant Dhingra owned approximately $1,364,552.72 worth of CareDx stock.

57. Collectively, Defendants Seeto, Bickerstaff, Cohen, Colón, Cournoyer, Goldberg, Hagstrom, Maag, Snyderman, Torres, Valantine, and Dhingra are referred to herein as the "Individual Defendants."

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

58. By reason of their positions as officers, directors, and/or fiduciaries of CareDx and because of their ability to control the business and corporate affairs of CareDx, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in the best interests of the Company and its shareholders.

59. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and

future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

60. The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with the Company, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of the Company.

61. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b) conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system

of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d) remain informed as to how the Company conducted its operations, and, upon receipt of notice or information about imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e) ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f) ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

62. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

**THE CODE OF CONDUCT**

63. The Individual Defendants, as officers and/or directors of CareDx, were bound by the Company's Code of Business Conduct and Ethics (the "Code of Conduct").

64. The Company's Code of Conduct applied to all officers, directors and employees, and outlined the following requirements:

- honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;
- full, fair, accurate, timely and understandable disclosure in reports and documents we file with or submit to the U.S. Securities and Exchange Commission and in our other public communications;
- compliance with applicable laws, rules and regulations;
- the prompt internal reporting of violations of this Code;
- protection for persons reporting any behavior pursuant to this Code; and
- accountability for adherence to this Code.

65. The Code of Conduct unequivocally required that Company employees comply with the law and warns potential violators of civil and criminal liability:

> ***You are responsible for complying with all laws, rules, regulations and regulatory orders applicable to the conduct of our business***. In developing, implementing, and applying this Code and other applicable policies and procedures, the Company is guided by applicable industry guidance, including, the AdvaMed Code of Ethics in Interactions with Health Care Professionals, voluntary compliance guidance issued by the Department of Health and Human Services Office of the Inspector General (HHS-OIG), applicable provisions of the Federal Food Drug and Cosmetics Act, as well as regulations and guidance issued by the Food and Drug Administration (FDA) and the Federal Trade Commission…
>
> ***Violations of laws, rules, regulations and orders may subject you to individual criminal or civil liability, in addition to discipline by the Company. Violations may also subject the Company to civil or criminal liability or the loss of business***.[1]

[1] All emphasis in quotations throughout this complaint has been added unless otherwise noted.

66. The Code of Conduct also required, in part, that those Company employees tasked with public communications use all reasonable efforts to ensure the accuracy of those communications:

> ***Individuals involved in the preparation of public reports and communications must use all reasonable efforts to comply with our disclosure controls and procedures, which are designed to ensure full, fair, accurate, timely and understandable disclosure in our public reports and communications.***
>
> ***If you believe that any disclosure is materially misleading or if you become aware of any material information that you believe should be disclosed to the public, it is your responsibility to bring this information to the attention of the Designated Legal Officer***. If you believe that questionable accounting or auditing conduct or practices have occurred or are occurring, you should notify the Audit Committee of the Board.

67. The Code of Conduct required employees and directors to keep accurate business records (and in particular, financial records), and to follow specific guidelines for managing records:

> [T]he Company expects you, regardless of whether you are otherwise required to be familiar with finance or accounting matters, to use all reasonable efforts to ensure that every business record or report with which you deal is accurate, complete and reliable.
>
> The Company is required by local, state, federal, foreign and other applicable laws, rules and regulations to retain certain records and to follow specific guidelines in managing its records. ***Records include paper documents, email, compact discs, computer hard drives, floppy disks, microfiche, microfilm and all other recorded information, regardless of medium or characteristics. Civil and criminal penalties for failure to comply with such guidelines can be severe for employees, agents, contractors and the Company***.

68. The Code of Conduct additionally required directors and employees to investigate and report violations.

69. The Code of Conduct, consistent with the securities laws of the United States and other statutes, prohibited employees from engaging in unlawful insider trading:

> You may not directly or indirectly—through, for example, significant others, family members or controlled entities—buy or sell stocks or other securities of the Company or any other Company based on nonpublic information obtained from your work at the Company…
>
> ***Under U.S. securities laws, it is unlawful for any person who has "material" nonpublic information about a Company to trade in the stock or other securities of that Company or to disclose such information to others who may trade***. Material nonpublic information is information about a Company that is not known to the general public and that a typical investor would consider important in making a decision to buy, sell or hold securities. Violations of U.S. securities laws may result in civil and criminal penalties, including disgorgement of profits, civil judgments, fines and jail sentences.

70. The Code of Conduct enabled CareDx to take disciplinary action against any employees or directors who violated the provisions of the Code of Conduct.

## <u>THE AUDIT COMMITTEE CHARTER</u>

71. CareDx also maintains an Audit Committee Charter (the "Audit Charter") that outlines the specific duties that the Audit Committee owes to the Company. Specifically, the Audit Charter provided for the following responsibilities of the Audit Committee:

- Provide oversight of the Company's accounting and financial reporting processes and the audit of the Company's financial statements;
- Assist the Board in oversight of (i) the integrity of the Company's financial statements, (ii) the Company's compliance with legal and regulatory requirements, (iii) the independent auditor's qualifications, independence and performance, (iv) the Company's internal accounting and financial controls, and (v) the organization and performance of the Company's internal audit function; and
- Provide to the Board such information and materials as it may deem necessary to make the Board aware of significant financial matters that require the attention of the Board.

72. Regarding review procedures, the Audit Committee is required to "Review[] and discuss[] with management . . . the annual audited financial statements and quarterly unaudited financial statements, including the Company's disclosures under 'Management's Discussion and

Analysis of Financial Condition and Results of Operations,' prior to filing the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q with the SEC[.]"

73. The review procedures require reviews of the Company's risk management policies.

74. Regarding regulatory compliance, the Audit Committee's duties required the following:

- Reviewing and discussing with management and the Company's independent auditors, as appropriate, the Company's guidelines and policies with respect to risk assessment and risk management, including risks relating to the Company's accounting matters, financial reporting and legal and regulatory compliance and the steps taken by management to monitor and control these exposures;

- In conjunction with the Board, reviewing and discussing with management, as appropriate, general business risks, insurance programs, including director and officer insurance, product liability insurance and general liability insurance;

* * *

- Overseeing compliance with the requirements of the SEC for disclosure of auditor's services and Audit Committee members, member qualifications and activities;

* * *

- Providing a report for inclusion in the Company's proxy statement in accordance with the rules and regulations of the SEC; and

- Establishing procedures for receiving, retaining and treating complaints received by the Company regarding accounting, internal accounting controls or auditing matters and procedures for the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

## SUBSTANTIVE ALLEGATIONS

75. In addition to AlloSure Kidney, CareDx offers a few other non-standard blood tests for indications that a patient might be rejecting an organ. AlloMap® Heart, for example, is

a gene expression test for heart transplant patients, while AlloSure® Heart, is a dd-cfDNA test for heart transplant patients. The Company's financial success, however, relied primarily on AlloSure Kidney. As Defendant Maag testified in another litigation, *CareDx, Inc. v. Natera, Inc.*, Case No. 19-662-CFC (D. Del.) (the "Natera Action"), he spent 90% of the Company's marketing budget on AlloSure Kidney, which Maag described as "***the one product, the one growth drive[r] for the company***[.]" (*id.* ECF 344-6, 367-8).

76. The Company's revenues are reported in three segments: (i) testing services; (ii) products; and (iii) patent and digital solutions. The testing services segment, which provides diagnostic surveillance testing services for solid organ transplant patients, has represented at least 85% of CareDx's total revenues since the beginning of 2020.

77. CareDx's testing services business relied heavily on payments from Medicare, which represented as much as 70% of the Company's testing services revenue, and as much as 60% of the Company's overall revenue, during the Relevant Period. As Defendant Maag testified in the Natera Action, Medicare was "the most important payer for this [AlloSure] patient population."

78. The amount the Company could charge for testing services varied from payer to payer, with the Company receiving its largest payments from Medicare reimbursement. Medicare reimbursement continued to play an outsized role in the Company's reported revenues and growth leading up to and during the Relevant Period. In the annual report filed on Form 10-K on February 24, 2021 (the "2020 10-K"), for example, the Company reported that tests performed on patients covered by Medicare represented 48% of all CareDx tests in 2020, but accounted for 67% of all testing revenue from 2020 because Medicare reimbursement paid more than commercial payers.

79. AlloSure Kidney launched in 2017, and the Company repeatedly stated that it had "received positive coverage decisions for reimbursement from Medicare," with a reimbursement rate of $2,841 per test, whereas private insurers might reimburse at a lower rate (if at all). Indeed, the "standard of care" blood test for post-operative kidney patients cost just $22. In the face of this, the Company acknowledged that generating testing services revenue was dependent upon, among other things, the number of tests performed on transplant patients and the establishment of coverage policies by third-party insurers and Medicare.

80. However, Medicare only agreed to reimburse patients' AlloSure Kidney tests on a "conditional" basis. Specifically, under the applicable Centers for Medicare & Medicaid Services ("CMS") regulations, CareDx's AlloSure Kidney test only was "covered to assess the probability of allograft rejection in kidney transplant recipients with clinical suspicion of rejection and to inform clinical decision-making about the necessity of renal biopsy in such patients at least 2 weeks post-transplant in conjunction with standard clinical assessment."

81. In other words, Medicare would only reimburse CareDx's flagship AlloSure Kidney test if a doctor determined that a patient already presented other warning signs indicating potential transplant rejection. Medicare would not reimburse AlloSure Kidney if it were used merely as a regular, periodic surveillance test for ordinary transplant recipients who did not show other warning signs of transplant rejection.

**A. CareDx Launches RemoTraC in Response to the COVID-19 Pandemic**

82. Likely as a result of the COVID-19 pandemic, the Company reported a significant slowdown in testing services volume in early 2020. As COVID-19 spread around the world, transplant volumes declined because immuno-compromised patients avoided hospitals and delayed medical procedures. Even patients who already had received transplants – also typically

immunocompromised – avoided non-essential medical tests and treatments. Accordingly, analysts and investors grew increasingly concerned that CareDx's growth would falter in response.

83. In late March 2020, reacting to the slowdown, CareDx quickly launched RemoTraC, a home-based blood draw solution for immune-compromised transplant patients, which the Company developed in a matter of days.

84. By mid-2020, RemoTraC had grown to represent half of CareDx's total testing volume, earning high praise from analysts as a "resounding success." Far from merely shielding the Company from COVID-related drops in volume and revenue, it emerged as a pivotal force driving CareDx's growth. As a March 2020 Craig-Hallum report noted, CareDx was "optimistic it will emerge a stronger company coming out of coronavirus," as "RemoTraC, CareDx's remote patient blood draw service, is surging in popularity with >100 centers signed up."

85. By the end of 2020, CareDx credited RemoTraC with preventing the Company from experiencing any COVID-related decline whatsoever in its testing services business.

86. In fact, CareDx claimed that RemoTraC had been so successful that it was becoming a permanent fixture of the Company's business. For example, during a February 18, 2021, BTIG investor conference, Defendant Seeto touted the sustainability of the RemoTraC business model:

> And I think what really stood out for me [with RemoTraC] is that we were able to put together a[n] offering and put together a structure within the course of four days. And I don't think you can really do that as a company if you don't have preexisting relationships and a preexisting pool from within that transplant community. So we were really pleased and honored to be able to then create this mobile phlebotomy service and scale it up, ***such that during Q2 [2020] 40% of our testing was done through mobile***. And so that really was sort of a new model for us. ***And that business is now something, which is sustainable*** and it's going to be maintained as 9 in 10 patients want to really keep the service. . . . So, again, I think

> RemoTraC was ***addressing an unmet need***. And I think what helped us is we could move very quickly to bring it to bear particularly during a time of crisis in the transplant community.

87. Later during the call, Defendant Seeto doubled down on RemoTraC's sustainability, stating that the Company expected RemoTraC to "be a core part of our business moving forward."

88. As discussed below, propelled by RemoTraC's apparent success, CareDx's stock price skyrocketed to an all-time high of $95.60 per share on June 28, 2022 – an increase of more than 330% over its price of approximately $22 per share at the beginning of the COVID-19 pandemic. The Individual Defendants took full advantage of the stock price inflation resulting from their fraudulent practices, with Defendants Maag and Seeto alone selling more than $37 million worth of CareDx stock combined during the Relevant Period.

**B. The Individual Defendants Falsely Claim that CareDx Materially Complied with Federal and State Regulations**

89. As a medical testing company, CareDx was subject to numerous federal and state regulations, including the civil False Claims Act (31 U.S.C. §§3729-3733), the administrative False Claims Law, the Medicare and Medicaid Fraud and Abuse Statute (42 U.S.C. §1320a-7b(b)) (the "Anti-Kickback Statute"), and the Physician Payments Sunshine Act section of the Patient Protection and Affordable Care Act of 2010, as amended by the Health Care and Education Reconciliation Act of 2010 (the "Sunshine Act"). These laws and regulations strictly prohibited CareDx from billing Medicare for tests that were not medically necessary, and either completely prohibited CareDx from providing monetary and non-monetary benefits to doctors, phlebotomists, or patients that could potentially be seen as kickbacks or, alternatively, required reporting of such benefits to regulatory authorities.

90. CareDx is also subject to the Stark Law, which provides that where a doctor has a "compensation arrangement" with a medical testing company like CareDx, the doctor may not refer patients to the company for services, and the company may not submit claims resulting from those referrals for payment by third-party payors like Medicare. A "compensation agreement" under the Stark Law is "any arrangement involving any remuneration between a physician . . . and an entity" like CareDx, and would include, for example, payments such as excessive speaking fees, expensive dinners and trips, and similar payments to doctors which CareDx routinely made to induce them to prescribe its products.

91. Throughout the Relevant Period, the Individual Defendants represented that the Company was in material compliance with these laws. For example, in a current report filed on Form 8-K with the SEC on January 21, 2021, the Company stated the following:

> ***The Company and, to the Company's knowledge, its directors, employees and agents (while acting in such capacity) are in material compliance with, all health care laws applicable to the Company***, or any of its products or activities, ***including, but not limited to, the federal Anti-Kickback Statute*** (42 U.S.C. Section 1320a-7b(b)), the Anti-Inducement Law (42 U.S.C. Section 1320a-7a(a)(5)), ***the civil False Claims Act*** (31 U.S.C. Section 3729 et seq***.), the administrative False Claims Law*** (42 U.S.C. Section 1320a-7b(a)), ***the Stark law (42 U.S.C. Section 1395nn)***, the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. Section 1320d et seq.) as amended by the Health Information Technology for Economic and Clinical Health Act (42 U.S.C. Section 17921 et seq.), the exclusion laws (42 U.S.C. Section 1320a-7), the Federal Food, Drug, and Cosmetic Act (21 U.S.C. Section 301 et seq.), the Controlled Substances Act (21 U.S.C. Section 801 et seq.), the Public Health Service Act (42 U.S.C. Section 201 et seq.), the Clinical Laboratory Improvement Amendments of 1988 (42 U.S.C. Section 263a), Medicare (Title XVIII of the Social Security Act), Medicaid (Title XIX of the Social Security Act), and ***the Patient Protection and Affordable Care Act of 2010, as amended by the Health Care and Education Reconciliation Act of 2010,*** the regulations promulgated pursuant to such laws, and any other state, federal or foreign law, accreditation standards, regulation, memorandum, opinion letter, or other issuance which imposes requirements on the manufacturing, development, testing, labeling, advertising, marketing or distribution of drugs and medical devices (including diagnostic products), ***kickbacks***,

> patient or program charges, recordkeeping, ***claims process, documentation requirements, medical necessity***, referrals, the hiring of employees or acquisition of services or supplies from those who have been excluded from government health care programs, quality, safety, privacy, security, licensure, accreditation or any other aspect of providing health care, clinical laboratory or diagnostics products or services (collectively, "Health Care Laws"). . . . ***To the Company's knowledge, there are no facts or circumstances that would reasonably be expected to give rise to material liability of the Company under any Health Care Laws***.

92. The Company's 2020 10-K stated the following with regard to compliance with laws and regulations:

> ***While we believe that we are currently in material compliance*** with applicable laws and regulations relating to our LDTs, ***we cannot be certain that the FDA or other regulatory agencies would agree with our determination***. A determination that we have violated these laws, or a public announcement that we are being investigated for possible violation of these laws, could hurt our business and our reputation.

93. The 2020 10-K did not disclose any present or impending claims alleging that the Company violated the federal False Claims Act. Rather, it stated "[o]ur future activities relating to billing, compliance with certain regulations and Medicare reimbursement requirements, physician and other healthcare provider financial relationships and the sale and marketing of our products may be subject to scrutiny under these laws."

94. In direct contradiction to these representations, the Individual Defendants knew, at the time the representations were made, that the Company had devised and was operating a scheme that involved systematically and deliberately violating these laws.

95. While the Individual Defendants attributed CareDx's financial success to demand for its testing services and the popularity of its RemoTraC home testing program, in reality, CareDx's testing services growth relied almost entirely on illegal schemes to bill Medicare fraudulently for unnecessary tests and pay kickbacks to phlebotomists and prescribing doctors in exchange for helping CareDx obtain blood samples for those tests. Among many illegal and

improper practices, the Individual Defendants took advantage of CareDx's RemoTraC home testing program to systematically push its expensive AlloSure tests – each of which cost Medicare $2,841, compared to just $22 for the routine, "standard of care" blood test for post-operative kidney patients – on patients who did not need the test and did not meet Medicare's criteria for receiving them.

**C. The Individual Defendants Mislead the Market About the Success of RemoTraC**

96. On April 30, 2020, CareDx filed a quarterly report for the period ending March 31, 2020, with the SEC (the "Q1 2020 10-Q"). The Q1 2020 10-Q was signed by Defendant Maag. Appended to the Q1 2020 10-Q Q as an exhibit was a certification pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendant Maag, attesting that "the information contained in the [Q1 2020 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

97. The 1Q20 10-Q described the RemoTraC program stating:

> As a response to the COVID-19 outbreak, and to enable immune-compromised transplant patients to continue to have their blood drawn, in late March 2020 the Company launched RemoTraC, a remote home-based blood draw solution using mobile phlebotomy for AlloSure and AlloMap surveillance tests, as well as for other standard monitoring tests.[2]

98. The Q1 2020 10-Q reiterated the risk factors in CareDx's annual report filed on Form 10-K with the SEC on February 20, 2020 (the "2019 10-K"), stating that "[t]here have been no material changes in the risk factors that appear in Part I - Item 1A of our Annual Report on

---

[2] The Company made substantially the same statements about RemoTraC in additional SEC filings: the Q2 2020 10-Q signed by Defendant Maag; the Q3 2020 10-Q signed by Maag; the 2020 10-K signed by Defendants Maag and Seeto; the Q1 2021 10-Q signed by Defendant Seeto; the Q2 2021 10-Q signed by Defendant Seeto, the Q3 2021 10-Q signed by Defendant Seeto; the 2021 10-K signed by Defendants Seeto and Maag; the 2Q 2022 10-Q signed by Defendant Seeto; the August 4, 2022 Form 10-Q signed by Defendant Seeto; and the 3Q 2022 10-Q signed by Defendant Seeto. The 10-Qs and 10-Ks listed herein are defined below.

Form 10-K for the year ended December 31, 2019, filed with the SEC on February 28, 2020, or the Form 10-K[.]" One of these risk factors listed in the 2019 10-K addressed Medicare reimbursement, stating in part:

> ***We receive a substantial portion of our revenues from Medicare, and the loss of, or a significant reduction in, reimbursement from Medicare would severely and adversely affect our financial performance.***
>
> For the year ended December 31, 2019, revenue from Medicare for AlloMap Heart and AlloSure represented 66% of testing services revenue. However, we may not be able to maintain or increase our tests reimbursed by Medicare for a variety of reasons, including changes in reimbursement practices, general policy shifts, or reductions in reimbursement amounts. We cannot predict whether Medicare reimbursements will continue at the same payment amount or with the same breadth of coverage in the future, if at all.
>
> * * *
>
> If future reimbursement levels are less than the current price, our revenues and our ability to achieve profitability could be impaired, and the market price of our common stock could decline. We may also not be able to maintain or increase the portion of our tests reimbursed by Medicare for a variety of other reasons, including changes in reimbursement practices and general policy shifts.

99. Similarly, as Q1 2020 10-Q stated there were no material changes to the 2019 10-K, the Q1 2020 10-Q included the following descriptions of regulations CareDx must follow in the 2019 10-K:

> Below are certain key regulations applicable to our business.
>
> <u>Federal and State Fraud and Abuse Laws</u>
>
> Because of the significant federal funding involved in Medicare and Medicaid, Congress and the states have enacted, and actively enforce, a number of laws to eliminate fraud and abuse in federal healthcare programs. ***Our business is subject to compliance with these laws.***
>
> * * *

> *Anti-Kickback Statutes*
>
> The federal healthcare programs' Anti-Kickback Statute ***prohibits persons from knowingly and willfully soliciting, offering, receiving or providing remuneration, directly or indirectly, in exchange for or to induce either the referral of an individual, or the furnishing or arranging for a good or service, for which payment may be made under a federal healthcare program such as Medicare or Medicaid***.
>
> The definition of "remuneration" has been broadly interpreted to include anything of value, including, for example, gifts, certain discounts, the furnishing of free supplies, equipment or services, credit arrangements, payment of cash and waivers of payments. Several courts have interpreted the statute's intent requirement to mean that ***if any one purpose of an arrangement involving remuneration is to induce referrals of federal healthcare covered businesses, the statute has been violated***. Penalties for violations include criminal penalties and civil sanctions such as fines, imprisonment and possible exclusion from Medicare, Medicaid and other federal healthcare programs. In addition, ***violations of the Anti-Kickback Statute also are actionable under the federal False Claims Act.***
>
> Many states have adopted laws similar to the Anti-Kickback Statute. Some of these state prohibitions apply to referral of recipients for healthcare items or services reimbursed by any source, not only the Medicare and Medicaid programs.
>
> *Federal False Claims Act*
>
> The False Claims Act's "whistleblower" or "qui tam" provisions imposes liability on any person or entity that, among other things, knowingly presents, or causes to be presented, a false or fraudulent claim for payment by a federal healthcare program. The qui tam provisions of the False Claims Act allow a private individual to bring actions on behalf of the federal government alleging that the defendant has violated the False Claims Act and to share in any monetary recovery. In recent years, the number of suits brought against healthcare providers by private individuals has increased dramatically. In addition, various states have enacted false claims laws analogous to the False Claims Act, and many of these state laws apply where a claim is submitted to any third-party payer and not merely a federal healthcare program.
>
> When an entity is determined to have violated the False Claims Act, it may be required to pay up to three times the actual damages sustained by the government, plus civil penalties of between $5,500 and $11,000 for each separate instance of false claim. There are many potential bases for liability under the False Claims Act. Liability arises, primarily, when an entity

> knowingly submits or causes another to submit, a false claim for reimbursement to the federal government. The federal government has used the False Claims Act to assert liability on the basis of causing physicians ***to order excessive or unnecessary services***, providing false documentation in support of claims, kickbacks, off-label promotion of products, Stark Law violations and other improper referrals and CLIA violations, in addition to the more predictable allegations as to misrepresentations with respect to the services rendered. Our ***future activities relating to billing, compliance with the CLIA and Medicare reimbursement requirements, physician and other healthcare provider financial relationships and the sale and marketing of our products may be subject to scrutiny under these laws.***
>
> * * *
>
> ***Our employees***, consultants, principal investigators and commercial partners ***may engage in misconduct or other improper activities***, ***including non-compliance with regulatory standards and requirements***. In addition to the CLIA regulation, other federal and state healthcare laws and regulations that may affect our ability to conduct business, include, without limitation.
>
> * * *
>
> ***[T]he federal Anti-Kickback Statute, which constrains our marketing practices***, educational programs, pricing policies, and relationships with healthcare providers or other entities, by prohibiting, among other things, knowingly and willfully soliciting, receiving, offering or paying remuneration, ***directly or indirectly, to induce*** or reward, or in return for, either the referral of an individual or the purchase or ***recommendation of an item or service reimbursable under a federal healthcare program, such as the Medicare and Medicaid programs***
>
> * * *
>
> Because of the ***breadth of these laws*** and the narrowness of available statutory and regulatory exemptions, ***it is possible*** that some of our business activities could be subject to challenge under one or more of such laws.[3]

---

[3] The Company made substantially the same statements about legal compliance and "risk" factors in the Q2 2020 10-Q, Q3 2020 10-Q, 10-K 2020, Q1 2021 10-Q, Q2 2021 10-Q; and Q3 2021 10-Q. These statements were materially false and misleading for the same reasons that Defendant Maag's April 30, 2020, statement about "no material changes" to the "risks" set forth in the Company's Form 10-K 2019 Annual Report (*see infra*) were materially false and misleading when made.

100. The Q1 2020 10-Q contained a section titled, "Management's Discussion and Analysis of Financial Condition and Results of Operations" which stated in part:

> <u>Testing Services Revenue</u>
>
> Testing services revenue increased by $9.9 million, or 46%, for the three months ended March 31, 2020 as compared to the same period in 2019. This increase is primarily due to an increase of more than 5,000 test results provided in the three months ended March 31, 2020, compared to the same period in 2019.

101. The statements in the Q1 2020 10-Q were false and misleading as the increase in CareDx's revenue was attributed to legal conduct but, as would ultimately be revealed, the increase in revenue was caused by false Medicare claims and illegal kickbacks.

102. On April 30, 2020, CareDx held a conference call with analysts and investors. In his prepared remarks, Defendant Maag stated the following:

> Considering this [COVID-19] backdrop, our results this quarter were particularly strong. Up until the impact of COVID-19, we were well on track to exceed $40 million in total revenue for the first quarter.
>
> Our pledge to support our patients remains our focus. ***And as part of our efforts on March 17, we announced the launch of RemoTraC, our solution for enabling home-based monitoring for transplant patient.***
>
> ***Importantly, we created RemoTraC in response to hearing that patients were missing their check-in appointments and blood draw as a result of COVID crisis.*** This home-based blood draw solution using mobile phlebotomy ***reduces the necessary visit*** to labs and hospitals for immunosuppressed transplant patient.
>
> * * *
>
> ***Mobile phlebotomy has increased from 10% of our daily volume 8 weeks ago to now comprising over 50%.***
>
> Under the tremendous leadership of Reg Seeto, our President and Chief Business Officer, CareDx has pivoted extremely quickly.

103. Further on the April 30, 2020, earnings call, Defendants Maag had the following exchange with an analyst from Jeffries:

Brandon Couillard:

Hey, good afternoon. Peter, ***maybe just starting with RemoTraC, I'm surprised to hear it's already 50% of volumes.*** Is this just the new operating model for the business now? I mean, why go back to the old way? And as we think about the unit economics, are there some other positive offsets, spending avoidance that you might be able to realize such as lower requirements on your backend compliance and call centers that might help you offset some of the $100 added for the mobile phlebotomy?

Peter Maag:

Thank you, Brandon. Excellent question. I think there is really two types of feedbacks. ***One is patients absolutely love it***. Patients don't need to drive in for an hour or two, or maybe sometimes three, since they live remotely into the transplant center, then be in a waiting room, wait for their blood work. Have them maybe sometimes only 5 to 10 minute interactions with a nurse and everything is good, and then they travel back home. ***So, patients love the mobile phlebotomy, especially for those that are doing well.***

Clinicians I would say they're probably half -half. They love to see patients face to face. And they think there is a significant value in having the patient in visiting the center. But they also – the other half is just completely convinced that telehealth is here to stay. What does that mean for RemoTraC, that I think we continue to be flexible.

It's very clear that in a COVID crisis center like New York, most of these patients are going mobile. While in other transplant centers, there might be a stronger mix. But what it tells me that CareDx is actually excellent prepared in order to answer to these individual solutions. As we have always applied a center by center strategy.

Sometimes this is now a patient by patient strategy even. To your point about offsetting, I think one thing that will be very true is that RemoTraC allows us to have direct to patient communication that we have always been seeking and allows us to monitor and apply the surveillance schedule.

You might recall that we have updated that, we're losing sometimes a few surveillance visits on the go. And the closer we get to the patient, and the more interactions we have and the better we can actually help scheduling these visits, the more the fulfillment on their regular surveillance schedule will be true. ***So we see actually that there is a bit of an upside for us in terms of volume, making sure that these patients stick to their surveillance visit and get all their blood draws.***

104. Also on this call, the following exchange occurred with Defendants Maag and Seeto with an analyst form Piper Sandler:

> Steven Mah:
>
> Okay, great. And just a follow-up question ***on RemoTraC. Do you think transplant centers are going to integrate it into their protocols*** given that COVID-19 is relatively uncertain? Yes . There's going to be a second wave or every flu season. This is – we're going to go through the same thing. Do you…
>
> Peter Maag:
>
> I like also Reg Seeto, who's on the call, comment on that. But I would see that we will see probably flare-ups of COVID-19 in the country in different locations over the year. So I don't think that this will be entirely going away. But then we will have very local and regional responses to COVID-19. So I would say, we will stay flexible and this will be a center by center approach, but maybe, Reg, over to you talking about RemoTraC and our ability to pivot?
>
> Reginald Seeto:
>
> Yeah, thanks, Peter I mean, we've seen more than 150 centers ***expressed interest in RemoTraC***. And with that, ***we have a lot of protocols and surveillance patients being used***. So, I think with RemoTraC being incorporated as part of that with the current offering, I think in the future, we'll – as Peter mentioned, we'll start seeing more of this adoption potentially even on a protocol basis.

105. On June 9, 2020, the Company filed a Registration Statement and Prospectus with the SEC to raise $125 million. CareDx needed this money to continue operations as at the time, it only had about $32 million in cash and cash equivalents and an accumulated deficient of about $333.8 million. Thus, the Company was operating beyond its financial means. During the six quarters leading up to this June 2020 offering, CareDx showed a continual loss, in millions of dollars:

| Quarter Ending | Net Income |
|---|---|
| 12/31/18 | -3.75 |
| 03/31/19 | -7.53 |
| 06/30/19 | -7.85 |
| 09/30/19 | -1.81 |
| 12/31/19 | -4.78 |
| 03/31/20 | -5.82 |

106. The Registration Statement was signed by Defendant Maag with Defendants Goldberg, Bickerstaff, Cohen and Colón signing with Maag as their power of attorney. The Registration Statement noted:

> Investing in any securities offered pursuant to this prospectus, the applicable prospectus supplement and any related free writing prospectus involves a high degree of risk. Before making an investment decision, you ***should carefully consider*** the risks described under "Risk Factors" in the applicable prospectus supplement, any related free writing prospectus ***and in our most recent Annual Report on Form 10-K, or any updates in our Quarterly Reports on Form 10-Q***, together with all of the other information appearing in or incorporated by reference into this prospectus, the applicable prospectus supplement and any related free writing prospectus, before deciding whether to purchase any of the securities being offered.
>
> * * *
>
> [The] . . . "Risk Factors", in our Annual Report on Form 10-K for the year ended December 31, 2019, as filed with the SEC on February 28, 2020, ***and in our Quarterly Report on Form 10-Q*** for the quarter ended March 31, 2020, as filed with the SEC on ***April 30, 2020***, the applicable prospectus supplement and any related free-writing prospectus and elsewhere in the documents incorporated by reference into this prospectus.[4]

107. On June 10, 2020, CareDx issued a press release announcing the public offering (the "June 10, 2020 PR"), stating in part:

> SOUTH SAN FRANCISCO, Calif., June 10, 2020 (GLOBE NEWSWIRE) – CareDx, Inc. (Nasdaq: CDNA) . . . today announced the pricing of an underwritten public offering of 3,906,250 shares of its common stock at a

---

[4] The Registration Statement and Prospectus include the 2019 10-K and Q1 2020 10-Q under the heading "IMPORTANT INFORMATION INCORPORATED BY REFERENCE."

> ***public offering*** price of $32.00 per share. The gross proceeds to CareDx from this offering, before deducting underwriting discounts and commissions and offering expenses, are expected to be ***$125,000,000***. . . . The offering is expected to close on or about June 15, 2020, subject to the satisfaction of customary closing conditions.

108. On June 11, 2020, CareDx filed the underwriting agreement between the Company and the investment banks included in the offering. Understanding that the terms in the underwriting agreement were important to investors, the Individual Defendants referred to it as a "Material Definitive Agreement." The underwriting agreement was necessary to secure the ability to raise the additional, necessary funds – crucial to the Company's ongoing operations. Defendant Maag signed the underwriting agreement which falsely stated that CareDx complied with healthcare laws, stating in part:

> ***Compliance with Health Care Laws***. The Company and, to the Company's knowledge, its directors, employees and agents (while acting in such capacity) ***are in material compliance with, all health care laws*** applicable to the Company, or any of its products or activities, including, but not limited to, the ***federal Anti-Kickback Statute*** (42 U.S.C. Section 1320a-7b(b)), the Anti-Inducement Law (42 U.S.C. Section 1320a-7a(a)(5)), the civil ***False Claims Act*** (31 U.S.C. Section 3729 et seq.), the administrative False Claims Law (42 U.S.C. Section 1320a-7b(a)), ***the Stark law*** (42 U.S.C. Section 1395nn) . . . . To the Company's knowledge, there are no facts or circumstances that would reasonably be expected to give rise to material liability of the Company under any Health Care Laws.

109. The June 10, 2020 PR emphasized the significance of the stock offering, stating that the Company had priced an underwritten public offering of 3,906,250 shares of its common stock at $32.00 per share. Five days later, CareDx issued another press release announcing the closure of the same offering.

110. On August 4, 2020, CareDx filed a quarterly report for the period ending June 30, 2020, with the SEC (the "Q2 2020 10-Q"). The Q2 2020 10-Q was signed by Defendant Maag. Appended to the Q2 2020 10-Q was a signed SOX certification by Defendant Maag.

111. The Q2 2020 10-Q contained a section titled, "Management's Discussion and Analysis of Financial Condition and Results of Operations" which stated in part:

> Testing Services Revenue
>
> Testing services revenue increased by $10.6 million, or 41%, for the three months ended June 30, 2020 as compared to the same period in 2019. This increase is primarily due to an increase of more than 5,200 test results provided in the three months ended June 30, 2020, compared to the same period in 2019. Due to COVID-19, with transplant surveillance visits down, we experienced a slowdown in testing services volumes in the final weeks of March and during April 2020. Following the introduction of RemoTraC and with the easing of stay-at-home restrictions and the opening up of many hospitals to non-COVID-19 patients, the Company's testing services volumes returned to levels consistent with those experienced immediately prior to the COVID-19 pandemic, and volumes continued to be at or above those levels throughout May 2020 and June 2020.

112. On October 15 and 16, 2020, the Board held a meeting at which Defendants Bickerstaff, Cohen, Colón, Cournoyer, Goldberg, Hagstrom, Maag, and Snyderman were present. Defendant Seeto also attended portions of the meeting. *See* CAREDX-WOOD-00000001.[5] The Board deck distributed in connection with the meeting warned of certain "Issues and Complexities" with the Company's 5-year strategic plan:

> - **Testing Services is only the 1 of 4 business lines currently at scale (>$100M)** and profitable.
> - **Future 5-year success is highly dependent on growth** of this business line.

[5] Citations to "CAREDX-WOOD-########" are to documents produced by CareDx in response to a Section 220 demand. The document names contain Bates numbers, but the individual pages are not Bates numbered. Accordingly, citations to Bates numbers refer to documents, not specific pages where the quoted information appears.

- This business line is being **targeted by several larger competitors** now (Eurofins, Natera) and later (Labs/LDOs).

CAREDX-WOOD00000066 (emphasis in original).

113. According to the Board presentation, "[i]n order to deliver sustainable growth **and be able to succeed against larger entrants**[,]" CareDx would need to, among other things, "**[a]ccelerate our penetration** in the Testing Services business line[.]" *Id.*

114. On October 17, 2020, the day after the Board meeting, the Individual Defendants caused CareDx to post on the social media platform formerly known as Twitter[6] the following tweet directed to patients to let them know about CareDx's bundling program that would run a "standard panel of routine tests[.]" Similar tweets, some with different graphics, were also posted on June 13, 2020, August 21, 2020, and November 20, 2020. The October 17, 2020, tweet appeared as follows:

[6] June 13, 2020 (https://twitter.com/CareDx/status/1329933813036802050), August 21, 2020 (https://twitter.com/CareDx/status/1296826863294308362); October 17, 2020 (https://twitter.com/CareDx/status/1317535615039188994); November 20, 2020 (https://twitter.com/CareDx/status/1329933813036802050).




115. On October 29, 2020, CareDx filed a quarterly report for the period ending September 30, 2020 with the SEC (the "Q3 2020 10-Q"), which represented that there had been "no material changes in the risk factors" described in the Company's 2019 10-K.

116. As to the Company's testing services revenue, the Q3 2020 10-Q stated, in relevant part, as follows:

> Testing services revenue increased by $17.3 million, or 61%, for the three months ended September 30, 2020 as compared to the same period in 2019. This increase is primarily due to an increase of more than 8,500 AlloSure Kidney and AlloMap Heart patient results provided in the three months ended September 30, 2020, compared to the same period in 2019.

117. The Q3 2020 10-Q was signed by Defendant Maag. Appended to the Q3 2020 10-Q was a signed SOX certification by Defendant Maag.

118. The Q3 2020 10-Q contained a section titled, "Management's Discussion and Analysis of Financial Condition and Results of Operations" which stated in part:

> Testing Services Revenue
>
> Testing services revenue increased by $17.3 million, or 61%, for the three months ended September 30, 2020 as compared to the same period in 2019. This increase is primarily due to an increase of more than 8,500 AlloSure Kidney and AlloMap Heart patient results provided in the three months ended September 30, 2020, compared to the same period in 2019.

119. On January 20, 2021, CareDx issued another press release to announce another offering of up to 2,211,538 shares of common stock at $91 per share with the goal of raising another $175 million. The press release stated, in part:

> CareDx Announces Pricing of Public Offering of Common Stock SOUTH SAN FRANCISCO, Calif., January 20, 2021 (GLOBE NEWSWIRE) – CareDx, Inc. (Nasdaq: CDNA), a leading precision medicine company focused on the discovery, development and commercialization of clinically differentiated, high-value healthcare solutions for transplant patients and caregivers, today announced the pricing of an underwritten public offering of 1,923,077 shares of its common stock at a public offering price of $91.00 per share. The gross proceeds to CareDx from this offering, before deducting underwriting discounts and commissions and offering expenses, are expected to be $175,000,007. In addition, CareDx has granted the underwriters a 30 day option to purchase up to 288,461 additional shares of its common stock offered in the public offering on the same terms and conditions. The offering is expected to close on or about January 25, 2021, ***subject to the satisfaction of customary closing conditions***.

120. The Company filed a revised prospectus with the SEC on January 21, 2021, in connection with the June 9, 2020 registration statement. It repeated the Risk Factors set forth in the 2019 10-K, Q1 2020 10-Q, Q2 2020 10-Q, and Q3 2020 10-Q, thereby falsely and misleadingly assuring investors that the Company might theoretically violate "key regulations" such as the False Claims Act and Anti-Kickback Statute.

121. Also on January 21, 2021, CareDx filed the underwriting agreement that Seeto signed as well as various investment banks in the offering. The underwriting agreement was imperative for the offering so CareDx could continue its operations. As with the previous offering, the underwriting agreement falsely stated that CareDx was complying with healthcare laws, stating in part:

> ***Compliance with Health Care Laws***. The Company and, to the Company's knowledge, its directors, employees and agents (while acting in such capacity) ***are in material compliance with, all health care laws*** applicable to the Company, or any of its products or activities, including, but not limited to, the ***federal Anti-Kickback Statute*** (42 U.S.C. Section 1320a-7b(b)), Section 1320a-7a(a)(5)), the civil ***False Claims Act*** (31 U.S.C. Section 3729 et seq.), the administrative False Claims Law (42 U.S.C. Section 1320a-7b(a)), ***the Stark law*** (42 U.S.C. Section 1395nn) . . . . To the Company's knowledge, there are no facts or circumstances that would reasonably be expected to give rise to material liability of the Company under any Health Care Laws.

122. The Individual Defendants acknowledged that the underwriting agreement was "material" to investors, referring to it as the "Entry into a Material Definitive Agreement" in its January 21, 2021 Form 8-K. In that section for the 8-K, the Individual Defendants advised investors to review the underwriting agreement: "the Underwriting Agreement is incorporated herein by reference only to provide investors with information regarding the terms of the Underwriting Agreement, and not to provide investors with any other factual information regarding the Company or its business, and should be read in conjunction with the disclosures in the Company's periodic reports and other filings with the SEC."

**D. Dr. Olymbios Blows the Whistle About AlloSure**

123. On February 13, 2021, Dr. Olymbios served as the relator for a "whistleblower" action in the U.S. District Court for the Eastern District of New York, captioned *U.S. v. CareDx, Inc.*, Case No. 1:21-cv-00774 (the "Whistleblower Action"). The Whistleblower Action was

unsealed on October 7, 2024, and its allegations are incorporated herein by reference. As shown below, the Whistleblower Action demonstrates CareDx's pattern of systematically violating the law.

124. The Whistleblower Action prosecutes claims on behalf of the United States, 28 states, and the District of Columbia against: CareDx; Defendants Maag and Seeto; Shamik Dholakia ("Dholakia"), Senior Vice President for Medical Affairs and Clinical Operations for CareDx; and the Company's former Chief Marketing Officer, Sasha King ("King"), for violating the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq*. and corresponding state statutes to recover damages, civil penalties, and all other amounts provided for thereunder.

125. Dr. Olymbios is an extremely well-credentialed and credible relator. He attended medical school at Imperial College London, a top global university for surgery, and trained at the Royal Brompton and Harefield Hospitals in London, the preeminent specialist lung and cancer treatment facilities in the UK. Prior to joining the Company in 2019, he worked at the Heart Transplant Program of Cedars-Sinai Medical Center in Los Angeles. Dr. Olymbios has published dozens of articles on organ transplants and his research has been cited hundreds of times. He co-authored the international guidelines for the Management of Antibodies in Heart Transplant, an International Society for Heart and Lung Transplantation consensus documents. In short, Dr. Olymbios is a highly accomplished medical doctor whose professional knowledge gives weight to his observations of the Individual Defendants' wrongdoing.

126. Dr. Olymbios' Whistleblower Action reveals that CareDx, by and through Maag, Seeto, Dholakia, and King, submitted false claims to the CMS, 28 states, and the District of Columbia for payment or approval of AlloSure. Dr. Olymbios contends in the Whistleblower Action that the Company's reimbursement claims were unlawful because they were: (a) submitted

for a non-reimbursable use—routine, timed surveillance of kidney transplant rejection—while Medicare only covers AlloSure testing when clinical suspicion of rejection is present; (b) corrupted by kickbacks, violating the federal Anti-Kickback Statute and similar state laws, including fake grants, sham advisory boards, and other financial perks given to providers; (c) further compromised by kickbacks to patients, such as free mobile phlebotomy services and waived copayments, to boost usage of CareDx's offerings; and (d) based on deliberately falsified research, data, and information presented to the CMS, Medicare Administrative Contractors, and states to trick the government into approving CareDx as a Medicare and Medicaid billable provider. *See* Whistleblower Action, ¶ 2.

127. Dr. Olymbios avers in the Whistleblower Action that AlloSure's intended use was to evaluate the likelihood of kidney allograft rejection when there is a clinical suspicion of organ rejection, helping clinicians determine if a renal biopsy is necessary to confirm potential tissue rejection. *Id.*, ¶ 47.

128. When cells experience injury or die, fragments of cell-free DNA can appear in a patient's bloodstream. As explained in the Whistleblower Action, dd-cfDNA is thought to originate from the injured or dying cells of a transplanted organ from a donor. Testing for dd-cfDNA helps detect these fragments in the blood of a kidney transplant patient, indicating whether the donor kidney's cells are releasing DNA into the bloodstream—a potential sign of allograft cell injury or death. *Id.*, ¶¶ 48-49.

129. As Dr. Olymbios explained in the Whistleblower Action, Medicare decided to cover AlloSure only when a doctor identifies a "clinical suspicion of rejection," based on symptoms such as fever, proteinuria, hypertension, hematuria, dysuria, fluid retention, reduced urine output, abnormal blood counts, electrolyte imbalances, or elevated creatinine levels.

Accordingly, the CMS and other regulators would only reimburse providers for AlloSure when there was clinical evidence of rejection. This meant that providers ordered the test sparingly. *Id.*, ¶¶ 50-52.

130. Dr. Olymbios explained how CareDx's management hatched a scheme to have the test performed on a regular basis for surveillance of the kidney allograft, not only if the allograft showed clinical suspicion of rejection. *Id.*, ¶ 53.

131. The scheme relied on two key elements: aggressively promoting AlloSure for routine monitoring while offering substantial incentives (kickbacks) to doctors and other healthcare providers. CareDx representatives cultivated relationships with medical institutions and physicians to secure their cooperation in conducting flawed studies, crafted to bolster the scheme. The strategy hinged on convincing doctors that regular AlloSure testing over the first three years after a kidney transplant could predict rejection, despite lacking evidence that such monitoring was effective, beneficial to transplant outcomes, or cost-efficient. Maag, Seeto, Dholakia, and King knew that this extended testing would generate significant profits for CareDx. Dr. Olymbios asserts that the only reason CareDx stops pushing surveillance testing after three years is that Medicare ceases covering kidney transplant treatments at the 36-month mark. *Id.*, ¶ 54.

132. To execute this plan, which demanded a major shift in CareDx's business and marketing approach, Dr. Olymbios explained that members of management overhauled the Company's leadership, and uncooperative executives—including the former Chief Medical Officer, Chief Commercial Officer, Chief Operating Officer, and Chief Scientific Officer—were replaced with younger, less experienced, and presumably more compliant individuals. *Id.*

133. Members of management even introduced the AlloSure Routine Testing Schedule ("ARTS") protocol, mandating monthly tests for the first four months post-transplant, followed by quarterly tests starting at six months and continuing through 36 months—a total of fifteen tests, yielding CareDx approximately $42,615 per patient from Medicare. *Id.*, ¶ 56.

134. CareDx's aggressive marketing leaned on dubious research, often produced by its own employees, or paid physicians and scientists, to persuade doctors of the ARTS protocol's value. The Company targeted community nephrologists—doctors caring for transplant patients after discharge from surgeons, typically six to twelve weeks post-transplant—with false claims that AlloSure was suitable and approved for ongoing rejection monitoring. Yet Medicare only reimburses AlloSure when clinical evidence suggests rejection is already occurring, and the ARTS protocol lacks any credible studies proving its medical necessity or benefit to kidney graft survival. CareDx's pitches to transplant surgeons, nephrologists, and other medical staff rested on fabricated data and misleading assertions about AlloSure's effectiveness for surveillance. *Id.*, ¶¶ 53-60.

135. In September 2020, CareDx refreshed its marketing, branding AlloSure a "liquid biopsy" and claiming it enhanced "long-term kidney graft survival"—assertions unsupported by evidence. Despite Medicare's refusal to cover surveillance use, CareDx promoted its "surveillance protocol" and falsely claimed superior accuracy over other rejection detection methods. It boasted of widespread adoption—160 centers and 60,000 patient results—achieved through market manipulation with deceptive data. *Id.*

136. To maximize testing, CareDx deployed Patient Care Managers ("PCMs") to contact patients, mostly Medicare beneficiaries, securing consent to bill Medicare, assuring

patients of no cost, and ensuring adherence to the ARTS schedule. PCMs earned bonuses for boosting compliance metrics, like standing ARTS orders at medical centers. *Id.*

137. Defendant Seeto bragged in a leadership meeting that PCM efforts raised surveillance testing adherence from 50% to 70%. Internal records reveal how CareDx marketed Surveillance AlloSure despite its lack of Medicare coverage, then billed Medicare anyway. Marketing staff held "advisory board" meetings with doctors and administrators, "educating" them on noninvasive surveillance with AlloSure, claiming it enabled earlier rejection detection and supported long-term graft survival—omitting any mention of requiring clinical suspicion of rejection. *Id.*

138. CareDx's marketing team seized every chance to push Surveillance AlloSure, emphasizing it in advisory board agendas as early as November 2019 and pressuring doctors by suggesting negligence if they did not use it. A March 2020 presentation even prompted physicians to justify not using AlloSure for monitoring. Defendant Maag once admitted to Dr. Olymbios in a New York City meeting that CareDx would have collapsed without this surveillance push. The Company also urged major medical centers to adopt the ARTS protocol, tracking compliance and celebrating over sixty of the 250 U.S. kidney transplant centers signing on. Sales reps landing these deals earned bonuses up to $20,000, with successes like Charleston Area Medical Center and Banner University Hospital adopting ARTS for all new transplant patients, regardless of rejection signs. Community nephrology groups, like The Nephrology Group in Fresno, were also sold on the protocol, with signed agreements proudly displayed in CareDx's Brisbane offices. *Id*.

139. The Whistleblower Action further detailed how CareDx lavished transplant surgeons and community nephrologists with illegal incentives—such as honoraria, grants, lavish

meals, hotel stays, and exclusive office support services for AlloSure patients—to persuade them to adopt Surveillance AlloSure and adhere to its protocol. *Id.*, ¶¶ 74-89.

140. For instance, CareDx pays transplant physicians $500 per hour and community nephrologists $300 to $500 per hour to attend "Advisory Board" meetings, typically virtual and lasting about an hour. These meetings are thinly veiled sales pitches for AlloSure, led by marketing and sales staff who toss in a few questions—like "What stops you from using dd-cfDNA (AlloSure) to monitor your kidney transplant patients?" or "If you're not using AlloSure, will you in the future?"—to legitimize the "Advisory Board" label and justify the hefty payments. Consistent with the foregoing, one former CareDx employee referenced in the Third Amended Class Action Complaint described how Defendant Seeto attended training meetings where personnel were instructed that AlloSure should always be ordered as part of RemoTraC regardless of medical necessity, a directive that came from the "top down."

141. Some doctors attended these confabs repeatedly—one even admitted in 2019 he kept coming back to fund a new roof. By August 2020, community nephrologists were offered $500 for a one-hour meeting, with CareDx soliciting recommendations for other willing attendees in an August 4, 2020, email. *Id*. This is confirmed by a former employee referenced in the Third Amended Class Action Complaint, who recalled that CareDx "had a bunch of cash, and we could basically buy [the doctors'] business," and that Defendant Seeto personally directed CareDx employees to conceal these kickbacks by treating them as educational events and falsely increasing the number of doctors who actually attended them.

142. CareDx also doled out substantial grants and funding for so-called Investigator Initiated Trials ("IITS") where physicians allegedly design and then conduct clinical research. In reality, CareDx crafts the protocols and sponsors the studies, funneling money to institutions and

practices willing to order Surveillance AlloSure in exchange. The aim is not scientific discovery but rather patient recruitment and test orders. *Id.*, ¶ 74.

143. In 2019, CareDx approved 49 grants and IITs. By April 2020, it had 51 grants and 29 IITs either funded or approved, totaling $8,958,000—with $1.58 million already spent and $6.8 million earmarked for IITs. These payments, disguised as research support, are kickbacks to secure Surveillance AlloSure orders and data. CareDx does not oversee how the funds are used, require fair market value for services, or restrict their application—revealing their true purpose: incentivizing participation in studies like the Outcomes of KidneyCare in Renal Allografts ("OKRA"), which tests Surveillance AlloSure's efficacy. *Id.*, ¶ 77.

144. The OKRA study, building on the earlier Kidney Allograft Outcomes AlloSure Registry ("KOAR"), claimed to assess whether adding AlloSure to rejection monitoring improves outcomes compared to traditional methods. Its primary goal was to see if AlloSure reduces kidney biopsies; a secondary aim was validating KidneyCare (including AlloSure). Yet, CareDx marketed Surveillance AlloSure as proven since 2018, undermining the "study" premise while paying millions of dollars to medical centers for participation. Worse, CareDx billed Medicare for Surveillance AlloSure tests within these studies, limiting enrollment to Medicare Part B patients—despite Medicare only covering AlloSure for clinical suspicion of rejection, not research, and explicitly barring payment for study-related tests. *Id.*, ¶ 79.

145. These sham IITs and grants—supporting centers like St. Barnabas, Montefiore, Weill Cornell, Mount Sinai, Baylor, and others—generated data to prop up Surveillance AlloSure, which CareDx already bills to Medicare. The Individual Defendants knew this was illegal. In fact, a July 28, 2020, presentation slide admits that billing Medicare for study-related services requires specific conditions (*e.g.*, Clinical Trial Policy, Coverage with Evidence Development, or

Investigational Device Exemption)—none of which apply to Surveillance AlloSure. Every Medicare Local Coverage Determination restricts AlloSure to cases with clinical rejection signs, and Medicare demands all payers be eligible for study participation, yet CareDx excludes private insurers. *Id.*, ¶ 82.

146. When Baylor questioned this billing, Dr. Olymbios raised concerns in a July 22, 2020, email, only to be directed to Danielle Scelfo ("Scelfo"), CareDx's reimbursement head, who admitted that Medicare should not be billed for study-related AlloSure tests. The Renal Disease Research Institute in Dallas had declined participation in June 2020, citing payer concerns over charging for tests typically covered by study sponsors. Despite this, Defendant Maag reassured skeptical providers like Dallas Nephrology Associates that Scelfo had vetted the practice with lawyers, flattering the practice as ideal for "high-quality research." Scelfo, however, told Dr. Olymbios that she opposed Medicare claims for Surveillance AlloSure—yet CareDx persisted in submitting them. *Id.*, ¶ 84.

147. CareDx also sweetened the deal by assigning employees, like PCMs, to physician practices solely to enforce AlloSure protocols. On October 2, 2019, CareDx offered PCMs to a North Carolina practice to track thirty difficult patients, ensuring appointments and blood draws. Johns Hopkins accepted a full-time in-house coordinator for AlloSure support—another inducement to lock in Surveillance AlloSure orders. *Id.*, ¶ 89.

148. Dr. Olymbios further related how management offered CareDx patients incentives, such as waiving copayments and deductibles and providing free mobile phlebotomy services, to ensure they keep using Surveillance AlloSure. The sole reason for these complimentary services was to maintain patients' ongoing participation in Surveillance AlloSure testing. These incentives were extended to all patients, regardless of their financial situation. CareDx's goal with these

offerings was to sustain a consistent stream of Surveillance AlloSure tests and to charge Medicare and Medicaid for them. *Id.*, ¶¶ 90-99.

149. Even worse, CareDx falsified data and ghostwrote studies claiming that AlloSure effectively predicted allograft rejection, using these to convince physicians to adopt Surveillance AlloSure and generate Medicare billing opportunities. By late 2019, facing competition from Natera and Trugraf, CareDx struggled to dominate the rejection testing market. Despite knowing that AlloSure offered no edge—especially for T-cell mediated rejection ("TCMR1A")—Defendants Maag and Seeto, and Dholakia manipulated evidence to suggest it detected low-grade or ambiguous rejection. In a November 1, 2019, email, Dholakia directed staff, including Dr. Olymbios, to fabricate a conclusion supporting AlloSure's surveillance use for TCMR1A and cherry-pick data to back it. They hired scientists to write a journal article, supplying skewed data while omitting evidence of AlloSure's ineffectiveness, which employees flagged but management ignored. A biostatistician quit over ethical concerns. *Id.*, ¶ 101.

150. The article, submitted to the American Journal of Transplantation in September 2019, was rejected three times. Dholakia leveraged a personal connection with editor Allan Kirk, emailing him from a personal account and later sending a gift, securing its eventual online-only publication. CareDx also ghostwrote abstracts for the 2020 ISHLT conference, with Dholakia crafting at least eleven and offering them to physicians to claim as their own. Anticipating the journal publication, Defendants Maag and Seeto, as well as Dholakia, launched a study called "Resolution by AlloSure Differentiates Ambiguous Rejection" to brand AlloSure as a superior "transplant algorithm" and ghostwrote more articles—like one accepted by Oxford's Fungai Dengu in July 2020. In August 2020, Defendant Seeto and Dholakia published another piece lauding AlloSure, hiding their CareDx ties with fake bios until the journal issued a correction.

These efforts aimed to expand AlloSure's use, secure Medicare coverage for surveillance, and win medical community acceptance—despite the lack of legitimate evidence. *Id.*, ¶¶ 100-110.

**E. The Individual Defendants Continue Misleading the Market about the Success of RemoTraC**

151. On February 24, 2021, the Company filed the 2020 10-K. Defendants Seeto, Maag, Bickerstaff, Cohen, Colón, Cournoyer, Goldberg, Snyderman, and Hagstrom signed the 2020 10-K. In a press release accompanying the 2020 10-K, the Company touted "record full-year revenue of $192.2 million, an increase of 51%" from the prior year and stated that testing services revenue for the quarter was $50.3 million, compared to $29.1 million in the same period of 2019. Defendant Seeto described 2020 as "transformational" for the Company, due to the Company extending its "leadership position in transplant centers through RemoTraC." The press release also contained 2021 guidance of $255 million to $265 million in revenue.

152. The 2020 10-K contained a section titled, "Management's Discussion and Analysis of Financial Condition and Results of Operations" which stated in part:

> Testing Services Revenue
>
> Testing services revenue increased by $59.1 million, or 56%, for the year ended December 31, 2020, compared to the same period in 2019. This increase is primarily due to an increase of more than 29,000 AlloSure Kidney, AlloMap Heart and AlloSure Heart patient results provided during the year ended December 31, 2020, compared to the year ended December 31, 2019.

153. The 2020 10-K stated the following regarding RemoTraC:

> As a response to the COVID-19 pandemic, and to enable immune-compromised transplant patients to continue to have their blood drawn, in late March 2020, we launched RemoTraC, a remote home-based blood draw solution using mobile phlebotomy for AlloSure and AlloMap surveillance tests, as well as for other standard monitoring tests. ***To date, more than 150 transplant centers can offer RemoTraC to their patients and over 6,000 kidney, heart and lung transplant patients have enrolled***. Based on

> existing and new relationships with partners we have established a nationwide network of more than 10,000 mobile phlebotomists.
>
> Following the introduction of RemoTraC and with the easing of stay-at-home restrictions and the opening up of many hospitals to non-COVID-19 patients, our testing services volumes returned to levels consistent with those experienced immediately prior to the COVID-19 pandemic, and through December 31, 2020, volumes continued to be at or above those levels since May 2020.
>
> In spite of the resurgence of COVID-19 infection rates, which resulted in increased stay-at-home and renewed travel restrictions, our testing services did not experience a decrease in testing services volumes.

154. The 2020 10-K also stated, in relevant part:

> While we believe that we are currently in material compliance with applicable laws and regulations relating to our LDTs, we cannot be certain that the FDA or other regulatory agencies would agree with our determination. A determination that we have violated these laws, or a public announcement that we are being investigated for possible violation of these laws, could hurt our business.

155. The 2020 10-K also stated, in relevant part:

> <u>Federal and State Self-Referral Prohibitions</u>
>
> We are subject to the federal self-referral prohibitions, commonly known as the Stark Law, and to similar state restrictions such as California's Physician Ownership and Referral Act, or PORA. Where applicable, ***these restrictions generally prohibit us from billing patients or certain governmental or private payers for clinical laboratory testing services when the physician ordering the test . . . has . . . [a] compensation arrangement with, us***, unless the arrangement meets an exception to the prohibition.
>
> Both the Stark Law and PORA contain exceptions for compensation paid to a physician for personal services rendered by the physician, provided that certain conditions are satisfied. We have compensation arrangements with a number of physicians for personal services, such as speaking engagements and clinical advisory boards. ***We have structured these arrangements with terms intended to comply with the requirements of the applicable exceptions to the Stark Law, PORA and other similar state laws***. However, we cannot be certain that regulators would find these arrangements to be in compliance with the Stark Law, PORA or similar state laws.

156. The 2020 10-K did not disclose any present or impending claims that the Company violated the federal False Claims Act, only stating: "Our future activities relating to billing, compliance with certain regulations and Medicare reimbursement requirements, physician and other healthcare provider financial relationships and the sale and marketing of our products may be subject to scrutiny under these laws."

157. Appended to the 2020 10-K as an exhibit was a SOX certification signed by Defendant Seeto attesting that "the information contained in the [2020 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

158. Later on February 24, 2021, Defendant Seeto represented the Company on an earnings call to discuss the fourth quarter and full year 2020 results. During the call, Seeto stated that "2020 was an exceptional year for CareDx as demand continued unabated for our innovative first-in-class suite of high-value health care solutions for transplant patients and caregivers."

159. On the conference call, Seeto had the following exchange with an analyst from Jefferies:

> Matthew Mishan -- Jefferies -- Analyst
>
> Thanks. And then just one last quick one ***on RemoTraC*** that you said it was ***40% of volumes here in the fourth quarter***. Any thoughts on how you're thinking about that in the first quarter here full year '21? And then any tweaks or improvements you've made to the program as you get more data and feedback as we approach the one year launch coming up next month? Thanks, guys.
>
> Reginald Seeto -- President and Chief Executive Officer
>
> Yeah. With -- I think with ***RemoTraC*** this is sign that was probably ***the highlight of last year*** what we did as an organization as we rallied around supporting patients and transplant centers with such an ***unmet need*** and we're able to put it together so quickly and had such a fantastic response that now more than 150 centers are using it.

160. Propelled by RemoTraC's apparent success, CareDx's stock price skyrocketed to an all-time high of $95.60 per share on June 28, 2021 – an increase of more than 330% over its price of approximately $22 per share at the beginning of the COVID-19 pandemic.

**F. The Individual Defendants Cause the Company to Continue Issuing False and Misleading Statements about the Company's Growth**

161. On May 5, 2021, the Company issued a press release announcing its financial results for the first quarter of 2021. The press release touted a "strong start to 2021" and stated that the Company was raising full-year guidance for revenue to a range of $270 million to $280 million.

162. That same day, during a conference call to discuss the Company's financial results, Defendant Seeto stated: "For our record first quarter, total revenue was $67.4 million, increasing 76% compared to a year ago quarter. The driver of the quarter's growth was our testing services revenue, which increased 89% to $59.3 million . . .."

163. One analyst on the call asked Defendant Dhingra what he thought "the steady-state level of RemoTraC will be going forward?" Defendant Dhingra responded:

> ***We don't expect substantial changes here in the near term. And that's our view from the long-term perspective as well***, is to say the size of the investment that we've made substantially represents a good structure for us for the medium term here and ***enables us continuing improvement in the gross margins***, especially from a path to 75% perspective.

164. That same day, the Company filed with the SEC a quarterly report on Form 10-Q for first quarter of 2021 (the "Q1 2021 10-Q"). Defendants Seeto and Dhingra signed both the Q1 2021 10-Q, as well as SOX certifications attesting that "the information contained in the [10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company." The financial results from the May 5, 2021, press release were reiterated in the Q1 2021 10-Q.

165. On June 1, 2021, Defendant Seeto attended the Jefferies Healthcare Conference. During the conference, Defendant Seeto described the Company's work in "the kidney space" as "an absolute winning formula" and emphasized that of the "1,000- plus community nephrology practices, we have more than 100 now using AlloSure as part of that." Defendant Seeto further claimed that "there's just so much opportunity for us, overall testing services TAM."

166. On June 8, 2021, Defendants Seeto and Dhingra attended the Goldman Sachs 42nd Annual Global Healthcare Conference. During a presentation at the conference, Defendant Seeto stated, in relevant part:

> I've been at a lot of companies that talked about patient first, patient centricity. ***And what I can say is CareDx actually lives and believes it. And it's just incredible. Every single town hall, we have these monthly, starts off with the patient. As we look at every single one of our presentations, it starts off with the patient***. If we think of who we hire, everyone has a connection to the patient.

167. During the conference, an analyst asked about "the cost side of RemoTraC going forward and the impact it might have on margins relative to the benefit that it's giving you in terms of connecting with the patient and an eventual – translate into eventual revenue, additional revenue?" In response, Defendant Dhingra stated that:

> I think the way we think about it, . . . ***RemoTraC is part of our structure***, right? ***It enables certain aspects of our growth, both in the near term in terms of driving adoption with our patients, but also in terms of becoming a foundation for our direct-to-patient strategy as well.*** So what was developed as part of a response to the pandemic ***eventually drove significant higher penetration for our tests, has become a solid strategic foundation.***

168. On July 29, 2021, the Company issued a press release announcing its second quarter 2021 financial results. The press release announced revenue growth of 77% year-over-year and again raised guidance for 2021 revenue to a range of $280 million to $290 million. The

press release also announced testing services revenues of $64.9 million, compared with $36.3 million in the same period of 2020, a 78% year-over-year increase.

169. That same day, the Company filed with the SEC its Form 10-Q for the period ended June 30, 2021 (the "Q2 2021 10-Q"). The Q2 2021 10-Q reiterated the financial results in the press release. Defendants Seeto and Dhingra signed the Q2 2021 10-Q, as well as SOX certifications attesting that "the information contained in the [Q2 2021 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

170. Later on July 29, 2021, Defendants Seeto and Dhingra took part in an earnings call to discuss the second quarter 2021 results. Regarding the Company's testing services revenue, Defendant Seeto stated that "[t]he main driver of growth in the quarter was from our testing services revenue, which increased 79% to $64.9 million." Defendant Seeto boasted that "more than 9,000 patients [] have signed up for RemoTrac" and further explained that "[o]ur direct to center approach remains core to our strategy, where we are focused on building the moat through an expanded portfolio of offerings within the transplant centers and by increasing the number of AlloSure testing protocols."

171. Defendant Dhingra also chimed in on the call, stating that the basis of increased revenue guidance was a "continued strong demand for our testing services in the United States" and added that "[w]e see great demand for our services and continuation of very positive response from patients."

172. The Individual Defendants' statements above were materially false and misleading statements and/or omissions designed to mislead the investing public. Specifically, the Individual Defendants failed to disclose that: (1) certain CareDx officers had engaged in various improper and illegal schemes to inflate testing services revenue and demand, including pushing a

surveillance protocol through inaccurate marketing materials, offering extravagant inducements or kickbacks to physicians and other providers, and improperly bundling expensive testing services with other blood tests as part of the RemoTraC service; (2) these practices exposed the Company to an undisclosed risk of regulatory scrutiny and/or liability under the federal False Claims Act, the Anti-Kickback Statute, the Sunshine Act, and the Stark Law; (3) these practices rendered the Company's testing services revenue reported throughout the Relevant Period artificially inflated; and (4) as a result, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading at all relevant times.

### G. The Company Issues Third Quarter 2021 Financial Results, Partially Revealing the Truth

173. On October 28, 2021, the Company issued a press release announcing its third quarter 2021 results. The press release announced that the Company "[g]rew testing services volume 86% year-over-year." The Company again raised revenue guidance for 2021, this time to a range of $290 million to $293 million.

174. That same day, the Company filed a quarterly report with the SEC on Form 10-Q (the "Q3 2021 10-Q"). The Q3 2021 10-Q disclosed that the Company was being investigated by the DOJ, the SEC, and an unnamed state regulatory agency:

> The Company recently received a civil investigative demand (CID) from the United States Department of Justice (DOJ) requesting that the Company produce certain documents in connection with ***a False Claims Act investigation being conducted by the DOJ regarding certain business practices related to our kidney testing and phlebotomy services***, ***and a subpoena from the United States Securities and Exchange Commission (SEC) in relation to an investigation by the SEC in respect of matters similar to those identified in the CID***, ***as well as certain of our accounting and public reporting practices***. ***The Company also received an information request from a state regulatory agency*** and may receive additional requests for information from the DOJ, SEC, or other regulatory and governmental agencies regarding similar or related subject matters.

175. During a related earnings conference call later that same day, Defendant Seeto claimed that "***The primary driver of revenue growth was from our testing services, which increased 46% to $66.5 million***. CareDx provided approximately 40,000 AlloSure and AlloMap patient results, growing 86% from the prior-year quarter." Defendant Seeto went on to add that:

> For kidney testing, we continue with ***our winning formula*** of protocol adoption and adding new centers. As of the end of September, more than 70 kidney transplant centers in the United States have now adopted regular AlloSure testing and more than 320 kidney centers and community practices were using AlloSure[.] ***[A]nd mobile phlebotomy as a percent of volume maintained approximately at 40%***.

176. Defendant Seeto then discussed the Company's supposed shift towards Non-Medicare payers, stating that: "We also continue to see a ***higher growth in non-Medicare business***. Overall, ***our business model of market penetration through addition of centers and patients continues to drive strong performance of our testing services business***."

177. During the same call, an analyst with Craig-Hallum asked Defendants Seeto and Dhingra to comment on the lower ASPs for testing service revenue that the Company reported during the quarter and asked whether they had seen "any changes in Medicare billing practices[.]" In response, Defendant Dhingra denied any such change: "any change in the billing practices? No, no change. We haven't observed anything on the Medicare billing practices." Elaborating upon that statement, Dhingra claimed that lower ASPs were the result of change in the "overall mix of business":

> ***One, . . . our overall mix of business, as we see higher adoption, we're seeing much higher mix of growth in the non-Medicare part of the business. And so that's the, by far, the largest impact***. A lot of that is driven by you're seeing higher attach rates, say, on the AlloSure side, where our mix of coverage is much lower than the traditional kidney business. So that's one of the big contributors.

> To your specific question, any change in the billing practices? ***No, no change. We haven't observed anything on the Medicare billing practices***. It's primarily the business mix where the volume growth is exceptionally strong, but ***the mix continues to evolve away from the core Medicare business***.

178. Defendant Dhingra also provided the following statement regarding the 2022 outlook: "We expect our business model to continue to drive adoption, both across centers as well as in case of kidney, the nephrology settings. So that core business, we believe, can continue to drive meaningful double-digit growth."

179. Then, on October 29, 2021, in response to the numerous regulatory agency investigations, analysts at BTIG published a report about CareDx that stated: ***"The fact that [the Company] is being investigated by three different entities, both federal and at the state level, is notable. Based on our experience, disclosures of these sort typically bear some degree of merit[.]"*** BTIG also cut its price target for the Company from $118 to $100, a 15% decrease. Analysts also questioned management's official explanation for its ASP declines. The same Craig-Hallum analyst who had asked if anything had changed in the Company's Medicare billing practices reported: "***Rationale [for ASP decline] was higher commercial coverage, though we still question what changed q/q***." A Raymond James report similarly noted that the Company had cited "a shift towards commercial [payers] ***but offered little additional context***," and found that "***ASP dynamics, which received major focus on the call, are admittedly a bit murky***."

180. On this news, the Company's stock price dropped from a previous close of $70.34 per share to a closing price of $51 per share on October 29, 2021. The stock continued to decline over the next week, eventually hitting a closing price of $47.04 per share on November 5, 2021. This represented a 33% decline from the October 28, 2021, closing price of $70.34.

181. On February 24, 2022, the Company filed an annual report on Form 10-K with the SEC for the year ending December 31, 2021 (the "2021 10-K"). The 2021 10-K was signed by each of the Individual Defendants. Appended to the 2021 10-K were SOX certifications signed by Defendants Seeto and Dhingra.

182. The 2021 10-K described the RemoTraC program stating:

> As a response to the COVID-19 pandemic, and to enable immune-compromised transplant patients to continue to have their blood drawn, in late March 2020, we launched RemoTraC, a remote home-based blood draw solution using mobile phlebotomy for AlloSure and AlloMap surveillance tests, as well as for other standard monitoring tests.

183. The 2021 10-K further stated that:

> <u>Federal and State Self-Referral Prohibitions</u>
>
> We are subject to the federal self-referral prohibitions, commonly known as the Stark Law, and to similar state restrictions such as California's Physician Ownership and Referral Act, or PORA. Where applicable, ***these restrictions generally prohibit us from billing patients or certain governmental or private payers for clinical laboratory testing services when the physician ordering the test . . . has . . . [a] compensation arrangement with, us***, unless the arrangement meets an exception to the prohibition.
>
> Both the Stark Law and PORA contain exceptions for compensation paid to a physician for personal services rendered by the physician, provided that certain conditions are satisfied. We have compensation arrangements with a number of physicians for personal services, such as speaking engagements and clinical advisory boards. ***We have structured these arrangements with terms intended to comply with the requirements of the applicable exceptions to the Stark Law, PORA and other similar state laws***. However, we cannot be certain that regulators would find these arrangements to be in compliance with the Stark Law, PORA or similar state laws.

184. During a related earnings conference call also on February 24, 2022, Defendant Seeto stated that:

> Q4 was another record quarter[] where we delivered revenues of $79.2 million, representing a growth of 35% over the prior year quarter. For the

> full year 2021, we reported revenues of $296.4 million, representing a growth of 54%. Notably, ***our record fourth quarter testing services volume*** of 41,900 tests represented a 67% year-over-year growth and led to our full year volume growth of 94% versus 2020.

185. Despite Defendant Seeto's stated optimism, the Company's volume of 41,900 tests versus its testing services revenue of $68.65 million for the quarter meant that the Company's ASP had again declined, to just $1,638 per test, versus more than $2,014 per test in the same quarter of the prior year – a decline of almost 20%.

186. Addressing this decline in ASPs, Defendant Dhingra provided the following explanation:

> The amazing success of AlloSure Heart, combined ***with higher growth of commercial versus Medicaid volumes in 2021 resulted in very strong volume growth that materially outpaced our revenue growth***.
>
> ***In addition, in kidney testing, we saw patients shift from Medicare to Medicare Advantage plans for the changes introduced with the CARES Act last year***.

187. The Individual Defendants' statements above regarding the higher mix of growth in the non-Medicare business impacting average selling prices and that nothing had changed with respect to Medicare billing practices were also false and misleading. The true cause of the Company's flagging Medicare growth and declining ASPs was the fact that, under scrutiny from the DOJ, the SEC, and a state regulator, the Company could no longer engage in its fraudulent and unsustainable RemoTraC scheme to bill Medicare for unnecessary tests and pay illegal kickbacks to phlebotomists and prescribing doctors, in violation of Medicare rules, the False Claims Act, and the Anti-Kickback statute.

188. Defendant Seeto's statements concerning "record" testing volumes, the number of patients with "direct access" to RemoTraC, and his purported explanations for the Company's continuing decline in ASPs were also false and misleading. Indeed, undisclosed to investors,

ASPs were actually declining because Medicare – including Medicare Advantage plans – was increasingly denying reimbursement for CareDx's clearly unnecessary and fraudulently billed AlloSure tests, and because the Individual Defendants were quietly winding down the unsustainable RemoTraC scheme.

### H. The Olymbios Complaint Further Reveals the Individual Defendants' Fraudulent Scheme

189. On April 15, 2022, Dr. Olymbios filed an action against the Company captioned *Michael Olymbios v. CareDx, Inc.*, Case No. 22-cv-01582, in the California Superior Court for San Mateo County. Echoing the then-sealed Whistleblower Action, the Olymbios Complaint alleged, *inter alia*, that CareDx "engaged in an unlawful campaign-bolstered by illegal inducements to physicians, misleading research, and recommendations for clinically unsupported treatment-to pad its sales." The allegations in the Olymbios Complaint are incorporated herein by reference.

190. Dr. Olymbios had served as CareDx's Head of Community Nephrology, in which capacity he supervised the team responsible for selling AlloSure Kidney to community nephrologists working in transplant centers, community hospitals, private clinics, and healthcare systems. Dr. Olymbios also oversaw clinical studies of AlloSure and reported directly to Defendant Seeto. In addition, Dr. Olymbios was a member of CareDx's Business Leadership Team. According to the Olymbios Complaint, Dr. Olymbios submitted notice of his resignation from the Company on October 7, 2020.

191. The Olymbios Complaint provided a highly detailed account of the Company's scheme to defraud Medicare, explaining that, in order to "***maximize potential revenue associated with AlloSure***, CareDx executives engaged in various forms of clinical and marketing schemes in an effort to justify AlloSure's use, even when that use ***lacked clinical support and fell outside***

***of the conditional approval extended to it***." In other words, CareDx systematically promoted the administration of AlloSure tests even where patients had not shown the "clinical suspicion of rejection" required by Medicare in order to reimburse the test, and then fraudulently billed Medicare for those tests. As such, the Company engaged in "***an unlawful campaign – bolstered by illegal inducements to physicians, misleading research, and recommendations for clinically unsupported treatment – to pad its sales***."

192. According to the Olymbios Complaint, CareDx's efforts to this end included, but were not limited to: (a) "pushing a[n investigational] 'surveillance' protocol for AlloSure;" – *i.e.*, promoting AlloSure's ***repeated and regular*** administration in patients not indicated for the test at all; (b) "***offering extravagant inducements or kickbacks*** to physicians and other providers to promote AlloSure"; (c) "representing that CareDx did not bill patients for its tests;" – a violation of the Anti-Kickback statute; (d) "organizing 'clinical studies' to push AlloSure on Medicare patients that were funded with condition-free grants"; and (e) "bundling AlloSure with other blood tests as part of a mobile phlebotomy services to induce physicians to order AlloSure" ***without regard to coverage guidelines***.

193. Dr. Olymbios recounted that, by no later than June of 2020, he had become aware of widespread misconduct regarding what was broadly considered "impermissible" Medicare reimbursement practices. For example, the Olymbios Complaint details that "[m]ultiple nephrology practices expressed serious reservations about [CareDx's] practice" of improperly bundling AlloSure with routine clinical screening tests, which these nephrology practices identified "as a violation of Medicare billing requirements." In fact, the impropriety of these billing practices was no secret throughout the Company, as "CareDx employees internally flagged this practice as impermissible." In addition, in order to sidestep protocols to ensure that tests were

medically necessary, the Company "***intentionally excluded*** from the test requisition form a field where a physician could indicate the reason ***why the test was medically necessary***."

194. Furthermore, the Olymbios Complaint detailed illegal kickbacks to physicians to maximize the number of patients improperly receiving the AlloSure test. For example, "CareDx offered unrestricted grants to physicians to not enroll patients in competitors' clinical trials or ***to induce practices to place patients on an AlloSure surveillance protocol, even when doing so was not warranted or authorized under Medicare billing guidelines***." CareDx also organized sham "advisory boards" that were "little more than marketing exercises to encourage physicians to order AlloSure tests."

195. As the Olymbios Complaint made clear, and as other former employees confirmed, the Individual Defendants systematically billed Medicare for tests that were not clinically or medically necessary, and for patients who did not meet Medicare's requirement that there be "clinical suspicion of rejection" to administer the test. As Dr. Olymbios explained, CareDx "used what it represented to be clinical tests to bill Medicare for the [AlloSure] tests." According to Dr. Olymbios, CareDx further increased the volume of unnecessary tests it billed for by "pushing a 'surveillance' protocol for AlloSure through inaccurate marketing materials" – in other words, pushing for regular testing of patients who did not even meet medical criteria for receiving ***one*** test.

196. Other witnesses corroborated Dr. Olymbios' claims.[7] One former Senior Executive Assistant to the Chairman and CEO described CareDx's practice of hosting "symposiums," where it paid for doctors' flights, limo services to and from the airport, hotels,

---

[7] As previously noted, many of the same statements by the same confidential witnesses are contained in all three amended complaints in the Federal Securities Class Action.

and bottles of champagne in the doctors' hotel rooms. They further explained that CareDx hosted two key opinion leader "summits" in San Francisco every year that started on Thursdays and ended on Fridays (*i.e.*, the summits lasted only about a day and a half). In spite of the brevity of these "summits," CareDx would then pay for attending doctors to spend the weekend in Napa Valley. The former Senior Executive Assistance directly observed these costs being placed on CareDx's corporate credit cards.

197. One former Senior Medical Science Liaison explained that CareDx's sales management personnel took doctors on "booze" cruises, helicopter tours, and expensive vacations in order to convince them to purchase products from the Company. As this witness has stated, it was common knowledge within the Company that these kickbacks were occurring.

198. Another key part of the Individual Defendants' scheme involved a systematic practice of paying illegal kickbacks to third party phlebotomists in exchange for blood draws – essentially, paying excessive fees to incentivize them to provide CareDx as many blood samples as possible, in express violation of CMS regulations and the federal Anti-Kickback Statute.

199. The CMS requires that phlebotomists get paid only a "nominal" per-specimen fee of $3-$5, or, at most, in certain COVID-related circumstances, $23-$25 per specimen.[8] Anything in excess of that nominal per specimen fee is considered an illegal kickback. However, a former Reimbursement Specialist cited in the Second and Third Amended Class Action Complaints, explained that, rather than paying the $3 fee required by regulations, CareDx regularly and systematically paid doctor offices and phlebotomists' "fees" of ***$100 per specimen*** to draw blood from patients.

---

[8] https://www.cms.gov/files/document/mln006818-clinical-laboratory-fee-schedule.pdf

200. In addition to the above abuses, CareDx also enrolled thousands of patients in large "studies" of its AlloSure test that were mere pretextual schemes to illegally bill Medicare for thousands of additional unneeded tests. Notably, Medicare regulations entirely prohibit billing for tests administered as part of a study, yet CareDx simply obfuscated its records to escape detection of the practice. As Dr. Olymbios explained in the Olymbios Complaint, CareDx "organiz[ed] 'clinical studies' that were funded with condition-free grants," and "offered unrestricted grants to physicians" to enroll patients in CareDx's studies rather than competitors' studies. In order to increase enrollments in its studies, CareDx made direct payments to doctors at as much as eight times the normal rate for enrolling their patients in AlloSure, but, critically, only if their patients were on Medicare (and thus could be reliably reimbursed at high rates for the tests provided in the study).

201. A Senior Clinical Trial Manager at CareDx explained that CareDx paid doctors who enrolled patients in an AlloSure study ***$35,000 to $40,000 per patient***, noting that "the[se] payments were ***excessive and very unusual for a simple registry study."*** In other words, CareDx paid doctors between ***600% to 700% more than market rates*** to enroll patients in its AlloSure study.

202. CareDx and its executives therefore blatantly violated the False Claims Act by improperly seeking reimbursement for the numerous tests provided for each participant in its massive KOAR study – tests that were ***not*** medically necessary under Medicare guidelines. Further, CareDx violated the Anti-Kickback Law by preselecting only Medicare patients for the KOAR study, paying exorbitant fees to doctors to enroll patients in the KOAR study, requiring each study participant to undergo a predetermined number of AlloSure tests in contravention of Medicare coverage guidelines and medical necessity, providing forms that made it more difficult

for the ordering physician to make an independent medical necessity decision with regard to each test, and failing to collect appropriate documentation by the physicians in a timely manner memorializing the physicians efforts.

203. Each of these facts, as highlighted by the Office of the Inspector General ("OIG"), are hallmarks of improper kickback schemes and violations of the Anti-Kickback Law.[9] The OIG of the Department of Health and Human Services warns that registry arrangements such as KOAR "***may induce physicians to order medically unnecessary or duplicative tests***, including duplicative tests performed for the purpose of obtaining comparative data, and to order those tests from laboratories that offer Registry Arrangements in lieu of other, potentially clinically superior, laboratories."

204. In addition, the OIG warns that it is a red flag for a study when: "The laboratory requires, encourages, or recommends that physicians who enter into Registry Arrangements perform the tests with a stated frequency (*e.g.*, four times per year) to be eligible to receive, or to not receive a reduction in, compensation." The KOAR study did exactly this, requiring testing at predetermined intervals. The OIG also warns of studies where: "The laboratory collects comparative data for the Registry from, and bills for, multiple tests that may be duplicative (*e.g.*, two or more tests performed using different methodologies that are intended to provide the same clinical information) or that otherwise are not reasonable and ***necessary***." The KOAR study met this criterion as well, as it required testing at predetermined intervals without regard to medical necessity as required by Medicare coverage guidelines.

---

[9] *See* Special Fraud Alert: Laboratory Payments to Referring Physicians, DEPARTMENT OF HEALTH AND HUMAN SERVICES, OFFICE OF THE INSPECTOR GENERAL (July 25, 2014), https://oig.hhs.gov/documents/special-fraud-alerts/866/OIG_SFA_Laboratory_Payments_06252014.pdf.

205. The OIG further warns of situations where: "Compensation paid to physicians pursuant to Registry Arrangements is not fair market value for the physicians' efforts in collecting and reporting patient data." As set forth above, CareDx paid physicians well above market value to enroll patients its AlloSure study.

206. As the Olymbios Complaint makes clear, when CareDx employees raised issues regarding the propriety of these activities, the Company "***repeatedly ignored or actively quashed any internal concerns about its activity***." According to Dr. Olymbios, even though he directly told Defendants Maag and Seeto about the illicit conduct, they "brushed off" his concerns or "berated" him.

207. According to a senior executive who reported directly to a C-Suite CareDx official, Dr. Olymbios was "vocal" about his Medicare billing concerns while he worked for the Company and said many other employees who did not raise concerns only refrained from doing so because "***we were all terrified for our jobs***."

208. According to the Olymbios Complaint, Defendants Seeto and Maag, among others, took active measures to avoid creating a paper trail of their misconduct. CareDx extensively used personal phones for company work and would save sensitive communications for text messages, such as the above text exchanges."

209. Specifically, the Olymbios Complaint alleged that Defendants Seeto and Maag communicated through applications such as WhatsApp and Signal so they could have "off-the record conversations and speak with candor about what they were actually doing. [Seeto] and/or [Maag] also told Dr. Olymbios that their reason for switching from WhatsApp to Signal was because of their belief that messages sent over Signal were not retrievable." Further, Defendant

Maag reportedly warned Dr. Olymbios that "there were certain things that shouldn't be in writing."

210. The Olymbios Complaint alleges that in or around July or August 2020, Dr. Olymbios drafted an email to Defendant Maag and others that CareDx "should put in a letter to a nephrology practice that CareDx never bills patients." In pertinent part, the Olymbios Complaint alleges that:

> Maag called Dr. Olymbios soon after he sent that email and ***said that he was calling because there were things he couldn't be associated with as the CEO. He also told Dr. Olymbios that there were certain things that shouldn't be put in writing, like saying that CareDx never billed patients, even if that's how CareDx operated***. Upon information and belief, based on this and other comments, ***Maag knew that CareDx's practices and representations regarding payment for AlloSure, its primary test, were unlawful and that he needed to take steps to avoid written records of CareDx's unlawful activity.***

211. The Olymbios Complaint further alleges that during Dr. Olymbios' exit interview, he "told Marissa Dixon, the Vice President of Human Resources at CareDx, that he had concerns about compliance with Medicare billing requirements. He also noted that he had conversations with Danielle Scelfo, Vice President of Market Access and Health Policy at CareDx, about these issues."

212. On the news of the Olymbios Complaint, CareDx stock fell to $35.41 per share on April 14, 2022, and then to $32.55 per share on April 15, 2022, a 14% decrease from the closing price of $38.02 on April 13, 2022.

**I. Despite the Revelations in the Olymbios Complaint, the Individual Defendants Continue to Cause CareDx to Issue False and Misleading Statements, but the Truth Continues to Slowly Trickle into the Market**

213. On May 5, 2022, the Company filed a quarterly report on Form 10-Q with the SEC for the first quarter 2022 ("2Q 2022 10-Q"). The 2Q 2022 10-Q was signed by Defendants Seeto

and Dhingra. Appended to the 2Q 2022 10-Q were signed SOX certifications by Defendants Seeto and Dhingra.

214. The 2Q 2022 10-Q described the RemoTraC program stating:

> As a response to the COVID-19 pandemic, and to enable immune-compromised transplant patients to continue to have their blood drawn, in late March 2020, we launched RemoTraC, a remote home-based blood draw solution using mobile phlebotomy for AlloSure and AlloMap surveillance tests, as well as for other standard monitoring tests.

215. During a related earnings conference call on May 5, 2022, Defendant Dhingra provided the following explanation for the continuing decline in ASPs:

> Although we look at ASP by test offering, we understand some investors may look at revenues divided by total tests. This aggregate average price declined by about 4.9% versus last quarter of 2021. This decline came from three factors: ***Higher growth in patients with commercial insurance*** across all organs, where we have lower coverage today; changing volume mix between organs with strong success of AlloSure Heart and AlloSure Lung, where we have lower coverage today; ***continued increase in Medicare [A]dvantage patients in our kidney Services***.
>
> * * *
>
> Specific now to kidney. Although the majority of patients are under Medicare, ***we have seen an increase in number of patients outside Medicare***, which is specifically impacting AlloSure Kidney realized prices. ***This mix shift has come from two areas. First, execution of our strategic plan to focus on community nephrology over the last 12 months, which has increased the number of patients on commercial coverage. This is expected to continue as a core part of the growth strategy.***
>
> ***The second has been industry shift from Medicare to Medicare Advantage plans, driven by the 21st Century Cures Act***.

216. An analyst then inquired:

> "***It was another big deterioration in price this quarter***. We know there's going to be some Medicare Advantage changes ahead of flush through, but I would say that's pretty change quarter-over-quarter. ***So what particularly new happened in Q1 to reduce that accruals for tests? And I guess, when do we reach a point where the ASP declines are going to stabilize and we can start to see them reverse***?"

217. Defendant Dhingra responded, in part, "we are anticipating this decline to continue through this year[.]"

218. As a result of this call, Raymond James lowered its price target of the Company's stock by $7. It also reported that "the key testing services bucked was nearly $5M shy of our view, landing at $66M."

219. On May 6, 2022, Craig-Hallum also issued a report after the earnings call and lowered its price target for the Company from $87 to $63. The report stated, "ASPs were a miss and dragged the Testing Services down well below our number and only an acquisition within Digital/Other brought the whole business back even."

220. On this news, the stock price fell to $25.78 on May 6, 2022, and continued to fall the following trading day, descending to $22.46, a 29% drop from the closing price on May 5, 2022.

221. On May 23, 2022, the Company announced that Defendant Dhingra had notified the Company of his resignation. Somewhat surprisingly, the press release announcing his resignation stated that Dhingra had only notified the Company of his resignation on May 18, 2022, and that his resignation would be effective May 25, 2022.

222. The press release went out of its way to reassure investors that Defendant Dhingra's resignation was "not a result of any disagreement with the Company or any matter relating to its accounting or financial policies or procedures or regulatory matters." However, the announcement caused CareDx's stock price to fall 7.5%, from a close of $25.86 per share on Friday, May 20, 2022, to a close of $23.92 per share on Monday, May 23, 2022, on unusually high volume. A Jefferies analyst report noted that the resignation was "***surprising, coming barely***

***more than a year since he joined CDNA***," and took note that it "***comes in the midst of certain ongoing gov't investigations***."

223. Just three months later, on September 1, 2022, the Company announced that King, its Chief Marketing Officer and Chief Commercial Officer, had announced her resignation from the Company on August 30, 2022, effective September 16, 2022. Just as Defendant Dhingra had done, King provided short notice of her resignation: a mere two weeks. On this news, CareDx's stock price fell from a close of $20.31 per share on September 1, 2022, to a close of $18.33 per share on September 2, 2022 – a decline of 10% – on unusually high volume.

224. On November 3, 2022, after market close, the Company issued a press release announcing its financial results for the third quarter of 2022, reporting that the Company's net loss widened by more than 40%, from $11.9 million in 3Q 2021 to $16.9 million in 3Q 2022. Critically, in spite of 15% growth in the number of tests performed versus the same quarter prior year, testing services revenue had actually ***declined*** by 3% from the same quarter prior year, from $66.5 million to $64.8 million. This meant that even as the Company foisted more tests onto patients, its total revenue from those tests was ***shrinking***. Indeed, based on its reported volume of 46,500 tests performed versus its $64.8 million in testing services revenue, ASP had declined to an all-time low of roughly $1,390 per test administered – a more than ***30% decline*** since 2020.

225. Attempting to put a positive spin on these disastrous results, the Individual Defendants made a striking admission: test revenue and ASPs were not actually declining primarily because of "payor mix" or an increase in patients with commercial insurance that reimbursed CareDx at lower rates, but because ***CareDx's tests were increasingly being denied any reimbursement at all***. Specifically, CareDx announced an entirely new metric – ASP per ***reimbursed*** test and told investors that this number had been "consistent" since Q1 2021, with an

average reimbursement of $2,500 per reimbursed test every quarter. The Individual Defendants touted this "consistent" number as a positive, insisting that ***when CareDx was reimbursed***, its pricing per test had not actually declined. However, critically, this meant that CareDx's declines in overall ASP were actually the result of a sharp increase in ***unreimbursed*** tests.

226. In addition, the Company's financial disclosures showed that its total Medicare revenue was continuing to decline as Medicare was simply rejecting more of CareDx's fraudulently administered tests. Indeed, in the third quarter of 2022, CareDx's ***total*** revenue from Medicare – its most critical source of revenue – fell almost 9% from the same quarter prior year, from $46 million to $42 million. Indeed, after several quarters of ***explosive*** growth in Medicare revenue from the Company's RemoTraC scheme, that growth suddenly hit a wall and reversed under scrutiny from the DOJ and SEC.

227. On this news, CareDx's stock price fell from a close of $18.73 per share on November 3, 2022, to $16.02 per share on November 4, 2022 – a decline of more than 14% – on unusually high volume.

228. In total, after the Individual Defendant's misrepresentations propelled CareDx's stock price as high as a close of $95.11 per share on June 28, 2021 – near its all-time high – CareDx's stock price fell to just $16.02 per share after the Relevant Period, ***losing more than 83% of its value*** after revelations of the Individual Defendants' fraudulent scheme, and wiping out billions of dollars in market capitalization.

**J. Subsequent Developments Provide Further Evidence of the Company's Fraudulent Practices**

229. During the Jefferies London Healthcare Conference on November 15, 2022, CareDx executives disclosed further details, inadvertently exposing that the real reason behind the Company's declining ASP was its inability to secure reimbursement for tests they had

previously billed fraudulently, which were now deemed medically unnecessary. First, CFO Jain now fully acknowledged that as much as "***50% of [our] tests are not being paid***." And second, the Individual Defendants now admitted that part of the reason for this enormous number of unpaid tests was that Medicare Advantage plans – which operated under the same coverage rules as Medicare – were simply applying greater scrutiny to CareDx's fraudulent claims for unnecessary tests.

230. Specifically, an analyst focused on the Individual Defendants' prior claims that CareDx was working on improving collections from Medicare Advantage plans. The analyst asked: "Is that a 12-month process? ***Why does it feel like we haven't seen any benefits from improved M[edicare] A[dvantage] collections***?" Strikingly, CFO Jain responded that the problem was that Medicare Advantage was simply ***more stringent about paying claims***.

231. Specifically, CFO Jain explained: "There's a pre-submission process, there is submission of the claim and then comes the appeals process. So when we started to see the shift last year from Medicare to the Medicare Advantage, now on the pre-submission side . . . ***they are requesting a lot of information around the medical records, the insurance information, and then the prior authorization [of the test by a medical provider]***." In other words, unlike with Medicare during the pandemic, CareDx now faced intensive scrutiny of its fraudulent medical claims. Indeed, as Jain complained, "even after you submit [the claim], ***they will basically reject the claim for [the] smallest of . . . reasons***." Jain further explained that, after its claims were rejected, the Company would have to go through a series of appeals, "a fairly long process" before the Company could collect – if ever. Indeed, Jain admitted that, while the Company was building "infrastructure" to improve collections from Medicare Advantage plans, "this whole infrastructure has to work like a well-oil[ed] machine because [if] one process . . . were to fail,

***then you will not be able to collect the money***." Jain's excuses about purported difficulties getting claims paid by Medicare Advantage plans were in stark contrast to competitor Natera's comments that it "***ha[dn't] been impacted by Medicare Advantage***," and had "***seen Medicare consistently reimbursed***." Jain's claims thus only underscored that the real reason CareDx's ASPs and Medicare revenue were declining was that it was no longer able to fraudulently bill Medicare for medically unnecessary tests.

232. Indeed, trends in CareDx's total Medicare revenue only further confirm that the Company's decline in ASP could not have been simply due to factors like a shift from Medicare to Medicare Advantage plans, as revenue from Medicare Advantage plans would still be included in overall Medicare revenue. Instead, it is clear that CareDx's Medicare revenue growth reversed and then declined exactly when the Company came under scrutiny in mid-2021 for its illegal practices, as the following numbers from the Company's quarterly reports demonstrate:

| Fiscal Quarter | Medicare Revenue Growth Percent |
|---|---|
| Q2 2020 | 15.10% |
| Q3 2020 | 32.20% |
| Q4 2020 | 12.60% |
| Q1 2021 | 16.10% |
| Q2 2021 | 11.90% |
| Q3 2021 | 1.90% |
| Q4 2021 | -6.60% |
| Q1 2022 | -0.40% |
| Q2 2022 | 1.50% |
| Q3 2022 | -3.40% |

233. On November 16, 2022, a Medicare committee held a meeting, which unequivocally confirmed that the real reason as many as 50% of CareDx's tests were being rejected for reimbursement was that CareDx was improperly billing for tests that were not medically necessary. Specifically, the very Medicare contractors who determine Medicare coverage of CareDx's tests invited CareDx to a Contractor Advisory Committee ("CAC")

meeting concerning tests for rejection of kidney and liver transplants. The following day, on November 17, 2022, Craig-Hallum analysts who covered the CAC meeting warned that ***Medicare had used "harsh language"*** questioning CareDx on why there had apparently been "unexpected utilization" of its tests for non-covered uses. Specifically, Craig-Hallum reported:

> MolDx [Medicare's Molecular Diagnostic Services program] held a Contractor Advisory Committee (CAC) meeting yesterday to discuss a range of topics around non-invasive transplant testing. . . . The meeting invite ***included strong language perking everyone's attention*** stating: MolDx "requested an internal reconsideration of [transplant diagnostic coverage] after noting ***unexpected utilization patterns that are outside of expectations based on evidentiary review and manufacturer documentation." Unexpected utilization is harsh language from Medicare***.

In other words, Medicare clearly had become fully aware of CareDx's scheme to bill for tests that were ***not*** medically necessary and did not meet coverage requirements and was no longer allowing CareDx's scheme to continue.

234. Finally, on November 1, 2023, the Company issued a press release announcing "today that Dr. Reginald Seeto will be stepping down from his position as Chief Executive Officer and President and resigning as a Director of the Board effective ***November 1, 2023***, and will transition to the role of Senior Advisor to the Chairperson . . . . The Board of Directors ***has initiated a search for a permanent CEO*** and is considering both internal and external candidates." The Company's announcement did not state why Defendant Seeto was "stepping down" immediately and without any permanent replacement.

**K. The Individual Defendants Cause the Company to Issue Materially False and Misleading Proxy Statements**

235. In addition to the foregoing, the Individual Defendants caused the Company to issue two false and misleading proxy statements during the Relevant Period. The first was filed

on April 30, 2021, on Schedule 14A (the "2021 Proxy Statement"), while the second was filed on May 2, 2022, on Schedule 14A (the "2022 Proxy Statement").[10]

236. Defendants Goldberg, Bickerstaff, Cohen, Colón, Cournoyer, Hagstrom, Snyderman, Maag, and Seeto solicited the 2021 Proxy Statement, which contained material misstatements and omissions.

237. The 2021 Proxy Statement called for shareholders to vote to, *inter alia*, re-elect Defendants Bickerstaff, Colón, and Snyderman to the Board.

238. Regarding the Audit Committee's responsibilities, the 2021 Proxy stated that the Audit Committee is responsible for, among other things: (1) "overseeing the Company's internal accounting and financial controls, including procedures for the treatment of complaints on accounting controls, internal accounting controls or auditing matters and procedures for the submission of confidential, anonymous employee comments about questionable accounting or auditing matter"; and (2) "reviewing the Company's guidelines and policies with respect to risk assessment and risk management, including risks relating to the Company's accounting matters, financial reporting, legal and regulatory compliance and general business risks and the steps taken by management to monitor and control these exposures[.]"

239. The 2021 Proxy Statement contained a section titled "Board of Directors' Role in Risk Oversight" that states:

> [O]ur Board of Directors, as a whole and assisted by its committees, has responsibility for the oversight of risk management. In its risk oversight role, our Board of Directors has the responsibility to satisfy itself that the

---

[10] These proxy allegations are solely based on negligence. They are not based on any allegations of recklessness or knowing conduct by or on behalf of the Individual Defendants, and they do not allege fraud. Plaintiffs specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the proxy allegations and related claims.

> risk management processes designed and implemented by management are appropriate and functioning as designed.
>
> Our Board of Directors believes that open communication between management and our Board of Directors is essential for effective risk management and oversight. Our Board of Directors meets with our Chief Executive Officer and other members of the senior management team at quarterly meetings of our Board of Directors, where, among other topics, they discuss strategy and risks facing the Company, as well as at such other times as they deem appropriate.
>
> While our Board of Directors is ultimately responsible for risk oversight, our board committees assist our Board of Directors in fulfilling its oversight responsibilities in certain areas of risk. Our Audit Committee assists our Board of Directors in fulfilling its oversight responsibilities with respect to risk management in the areas of internal control over financial reporting and disclosure controls and procedures, legal and regulatory compliance, and discusses with management and the independent auditor guidelines and policies with respect to risk assessment and risk management. Our Audit Committee also reviews our major financial risk exposures and the steps management has taken to monitor and control these exposures. In addition, our Audit Committee monitors certain key risks on a regular basis throughout the fiscal year, such as risk associated with internal control over financial reporting and liquidity risk. Our Nominating and Corporate Governance Committee assists our Board of Directors in fulfilling its oversight responsibilities with respect to the management of risk associated with board organization, membership and structure and corporate governance. Our Compensation Committee assesses risks created by the incentives inherent in our compensation policies. Finally, our full Board of Directors reviews strategic and operational risk in the context of reports from the management team, receives reports on all significant committee activities at each regular meeting, and evaluates the risks inherent in significant transactions.

240. The 2021 Proxy Statement was materially false and misleading because it failed to disclose that: (1) certain CareDx officers had engaged in a variety of improper and illegal schemes to inflate testing services revenue and demand, including pushing a surveillance protocol through inaccurate marketing materials, offering extravagant inducements or kickbacks to physicians and other providers, and improperly bundling expensive testing services with other blood tests as part of the RemoTraC service; (2) these practices exposed the Company to an

undisclosed risk of regulatory scrutiny and liability under the False Claims Act, the Anti-Kickback Statute, the Sunshine Act, and the Stark Law; (3) these practices rendered the Company's testing services revenue reported throughout the Relevant Period artificially inflated; and (4) as a result, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading at all relevant times.

241. The 2022 Proxy Statement was solicited by Defendants Goldberg, Bickerstaff, Cohen, Colón, Cournoyer, Hagstrom, Snyderman, Maag, Seeto, Valantine, and Torres and called for shareholders to, *inter alia*, re-elect Defendants Cohen, Cournoyer, and Hagstrom to the Board.

242. The 2022 Proxy Statement described the same responsibilities of the Audit Committee as listed in ¶ 238 and contained the same explanation of the Board's role in oversight as provided in ¶ 239. As a result, the 2022 Proxy Statement was materially false and misleading for the same reasons provided in ¶ 240.

## L. The Individual Defendants Were Aware of, or Consciously Disregarded, the Fraudulent Scheme

243. As alleged herein, the Individual Defendants acted with scienter because they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company during the Relevant Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

### 1. Defendants Seeto and Maag Employed a "Very Hands-on and Detail-Oriented" Management Style

244. In connection with the Natera Action between CareDx and one of its primary competitors, Defendant Maag was asked: "did you ***remain*** heavily involved in the decision making at CareDx?" Maag responded: "No, absolutely. You know, I ***think it's very important, I think my team would call me being very hands-on and detail-oriented, so, yes, I was very involved.***"

245. During that same testimony, Defendant Maag demonstrated that he was aware that Medicare constituted the Company's most important source of revenue. Defendant Maag was asked: "Did CareDx have to do anything to gain reimbursement for sales of AlloSure?" To which Maag responded: "Yeah. I would say that this was the pivotal study for us ***to get reimbursement from Medicare, which is the most important payer*** for this patient population."

246. Defendant Maag was also personally involved in AlloSure marketing. He testified at trial in another case that CareDx marketed AlloSure to "about 250, 300 transplant centers in the country" with "five to ten nephrologists per center." He was then asked: "Did ***you personally authorize the expenditures*** to educate the market on AlloSure?" Defendant Maag responded, "***Yes***. You know, we have the ***hiring of our field force and making sure that they have the materials available*** for them. That was in ***my oversight***." Defendant Maag testified after Natera, the Company's leading competitor, entered the market in early 2019, that it was "very important to understand that this [AlloSure marketing] was ***all hands-on deck***. This [AlloSure product] was ***the one product, the one growth driver*** for the company. And somebody was attacking our most important product."

247. One former employee, who was described as "high-ranking" in the Second and Third Amended Class Action Complaints, worked closely with, and reported directly to,

Defendant Seeto during his tenure as CEO. That employee relayed that Defendant Seeto had a very hands-on management style, similar to Defendant Maag. According to the former employee, Defendant Seeto was the type of person who, if he recognized any risk, would have been hands on and requested daily updates. For example, he described weekly "Business Leadership Team" meetings Defendant Seeto and other executives attended, at which Defendant Seeto would have in-depth reasons for upticks in testing volume in a particular week, month, or quarter.

248. That same employee also noted that Defendant Dhingra was unusually involved in the Company's business for a CFO. He recalled that Defendant Dhingra, like Defendant Seeto, knew what was going on in all aspects of the Company's business and was involved in managing the Company's market access team, even though this had nothing to do with his official duties as CFO.

249. Given the close level of involvement and monitoring that Defendants Seeto, Maag, and Dhingra exercised, it is implausible that all three would not have been aware of the performance and condition of programs like AlloSure and RemoTrac, thereby making them aware of the fraudulent scheme.

### 2. The Individual Defendants Sold Stock While CareDx's Stock Price Was Artificially Inflated

250. As a result of the above false and misleading statements, the Company's share price was artificially inflated. Certain of the Individual Defendants, while in possession of material, non-public information, capitalized on the artificially inflated stock price by selling significant portions of their holdings of CareDx common stock. Defendants Bickerstaff, Colón, Goldberg, Hagstrom, Maag, Seeto, and Snyderman (the "Insider Selling Defendants") collectively sold more than 850,000 shares of their personally held stock for collective gross

proceeds in excess of $50 million, and in doing so avoided collective losses of more than $37 million.

251. Defendant Bickerstaff made the following sales of CareDx common stock between May 13, 2020, and February 28, 2022, while the price of the Company's stock was artificially inflated, earning approximately $3.4 million in proceeds, substantially more than what he would have earned had investors known the truth about CareDx's business operations. Prior to the Relevant Period, Defendant Bickerstaff had not sold any shares of CareDx common stock. In a "FY2020 Directors' Questionnaire" completed by Defendant Bickerstaff on January 24, 2021, Defendant Bickerstaff indicated that he did not have a Rule 10b5-1 trading plan in place. *See* CAREDX-WOOD-00001772. In addition, according to the respective Form 4s filed with the SEC in connection with the below trades, none of the below trades were made as part of a 10b5-1 trading plan.

| Date | Shares | Avg. Price per Share[11] | Proceeds | Proceeds at $16.02 per Share | Losses Avoided |
|---|---|---|---|---|---|
| 5/13/2020 | 10,000 | $27.65 | $276,500.00 | $160,200.00 | $116,300.00 |
| 12/14/2020 | 10,000 | $71.76 | $717,600.00 | $160,200.00 | $557,400.00 |
| 5/12/2021 | 10,000 | $63.39 | $633,900.00 | $160,200.00 | $473,700.00 |
| 5/21/2021 | 10,000 | $75.63 | $756,300.00 | $160,200.00 | $596,100.00 |
| 2/28/2022 | 25,000 | $39.11 | $977,750.00 | $400,500.00 | $577,250.00 |
| **Totals** | **65,000** | | **$3,356,050.00** | **$1,041,300.00** | **$2,320,750.00** |

252. Defendant Colón made the following sale of CareDx common stock between March 9, 2022, and August 10, 2022, while the price of the Company's stock was artificially inflated, earning almost $230,000 in proceeds, substantially more than what she would have

[11] On certain days, the Insider Selling Defendants had multiple sales. This column represents an average price for the sales of each day.

earned had investors known the truth about CareDx's business operations. Prior to the Relevant Period, Defendant Colón had not sold any shares of CareDx common stock. In a "FY2020 Directors' Questionnaire" completed by Defendant Colón on February 8, 2021, Defendant Colón indicated that she did not have a Rule 10b5-1 trading plan in place. *See* CAREDX-WOOD-00001821. In addition, according to the respective Form 4s filed with the SEC in connection with the below trades, the below trades were not made as part of a 10b5-1 trading plan.

| Date | Shares | Avg. Price per Share | Proceeds | Proceeds at $16.02 per Share | Losses Avoided |
|---|---|---|---|---|---|
| 3/9/2022 | 1,393 | $34.56 | $48,142.08 | $22,315.86 | $25,826.22 |
| 5/11/2022 | 5,179 | $23.01 | $119,168.79 | $82,967.58 | $36,201.21 |
| 8/10/2022 | 2,521 | $24.81 | $62,546.01 | $40,386.42 | $22,159.59 |
| **Totals** | **9,093** | | **$229,856.88** | **$145,669.86** | **$84,187.02** |

253. Defendant Goldberg made the following sales of CareDx common stock between May 11, 2020, and April 11, 2022, while the price of the Company's stock was artificially inflated, earning approximately $6.9 million in proceeds, substantially more than what he would have earned had investors known the truth about CareDx's business operations. Prior to the Relevant Period, Defendant Goldberg had not sold any shares of CareDx common stock since March 14, 2019. In a "FY2020 Directors' Questionnaire" completed by Defendant Goldberg on January 25, 2021, Defendant Goldberg indicated that he did not have a Rule 10b5-1 trading plan in place. *See* CAREDX-WOOD-00001690. In addition, according to the respective Form 4s filed with the SEC in connection with Defendant Goldberg's trades on May 10 and May 11, 2021, neither trade was made as part of a 10b5-1 trading plan.

| Date | Shares | Avg. Price per Share | Proceeds | Proceeds at $16.02 per Share | Losses Avoided |
|---|---|---|---|---|---|
| 5/11/2020 | 10,000 | $29.86 | $298,600.00 | $160,200.00 | $138,400.00 |
| 12/14/2020 | 30,000 | $70.19 | $2,105,700.00 | $480,600.00 | $1,625,100.00 |
| 5/10/2021 | 15,442 | $68.59 | $1,059,166.78 | $247,380.84 | $811,785.94 |

| | | | | | |
|---|---|---|---|---|---|
| 5/11/2021 | 49,083 | $66.99 | $3,288,070.17 | $786,309.66 | $2,501,760.51 |
| 10/11/2021 | 500 | $62.50 | $31,250.00 | $8,010.00 | $23,240.00 |
| 11/9/2021 | 500 | $47.54 | $23,770.00 | $8,010.00 | $15,760.00 |
| 12/9/2021 | 500 | $45.41 | $22,705.00 | $8,010.00 | $14,695.00 |
| 1/10/2022 | 500 | $42.97 | $21,485.00 | $8,010.00 | $13,475.00 |
| 2/9/2022 | 500 | $42.96 | $21,480.00 | $8,010.00 | $13,470.00 |
| 3/9/2022 | 500 | $33.41 | $16,705.00 | $8,010.00 | $8,695.00 |
| 4/11/2022 | 500 | $36.01 | $18,005.00 | $8,010.00 | $9,995.00 |
| **Totals** | **108,025** | | **$6,906,936.95** | **$1,730,560.50** | **$5,176,376.45** |

254. Defendant Hagstrom made the following sales of CareDx common stock between May 6, 2020, and June 9, 2021, while the price of the Company's stock was artificially inflated, earning approximately $2.1 million in proceeds, substantially more than what he would have earned had investors known the truth about CareDx's business operations. In a "FY2020 Directors' Questionnaire" completed by Defendant Hagstrom on February 12, 2021, Defendant Hagstrom indicated that he did not have a Rule 10b5-1 trading plan in place. *See* CAREDX-WOOD-00001963. In addition, according to the respective Form 4s filed with the SEC in connection with the below trades, neither of the below trades were made as part of a 10b5-1 trading plan.

| **Date** | **Shares** | **Avg. Price per Share** | **Proceeds** | **Proceeds at $16.02 per Share** | **Losses Avoided** |
|---|---|---|---|---|---|
| 5/6/2020 | 15,000 | $29.12 | $436,800.00 | $240,300.00 | $196,500.00 |
| 11/12/2020 | 10,000 | $54.59 | $545,900.00 | $160,200.00 | $385,700.00 |
| 5/14/2021 | 10,000 | $67.06 | $670,600.00 | $160,200.00 | $510,400.00 |
| 6/9/2021 | 5,000 | $88.14 | $440,700.00 | $80,100.00 | $360,600.00 |
| **Totals** | **40,000** | | **$2,094,000.00** | **$640,800.00** | **$1,453,200.00** |

255. Defendant Maag made the following sales of CareDx common stock between May 19, 2020, and April 5, 2022, while the price of the Company's stock was artificially inflated, earning approximately $33.3 million in proceeds, substantially more than what he would have earned had investors known the truth about CareDx's business operations. According to the

respective Form 4s filed with the SEC in connection with Defendant Maag's trades on May 10 and May 11, 2021, neither trade was made as part of a 10b5-1 trading plan.

| **Date** | **Shares** | **Avg. Price per Share** | **Proceeds** | **Proceeds at $16.02 per Share** | **Losses Avoided** |
|---|---|---|---|---|---|
| 5/19/2020 | 30,000 | $32.24 | $967,200.00 | $480,600.00 | $486,600.00 |
| 6/5/2020 | 50,000 | $32.82 | $1,641,012.50 | $801,000.00 | $840,012.50 |
| 6/9/2020 | 1,818 | $35.00 | $63,630.00 | $29,124.36 | $34,505.64 |
| 6/30/2020 | 18,182 | $35.07 | $637,719.10 | $291,275.64 | $346,443.46 |
| 7/6/2020 | 10,000 | $34.21 | $342,098.00 | $160,200.00 | $181,898.00 |
| 8/5/2020 | 13,008 | $36.77 | $478,304.16 | $208,388.16 | $269,916.00 |
| 9/8/2020 | 10,000 | $31.68 | $316,800.00 | $160,200.00 | $156,600.00 |
| 9/30/2020 | 16,992 | $37.59 | $638,802.35 | $272,211.84 | $366,590.51 |
| 10/1/2020 | 20,000 | $40.82 | $816,301.00 | $320,400.00 | $495,901.00 |
| 10/5/2020 | 10,000 | $42.11 | $421,128.00 | $160,200.00 | $260,928.00 |
| 11/5/2020 | 10,000 | $53.48 | $534,800.00 | $160,200.00 | $374,600.00 |
| 12/7/2020 | 10,000 | $66.37 | $663,700.00 | $160,200.00 | $503,500.00 |
| 3/5/2021 | 10,000 | $62.05 | $620,500.00 | $160,200.00 | $460,300.00 |
| 4/5/2021 | 10,000 | $72.15 | $721,500.00 | $160,200.00 | $561,300.00 |
| 5/3/2021 | 20,000 | $76.96 | $1,539,200.00 | $320,400.00 | $1,218,800.00 |
| 5/5/2021 | 10,000 | $73.48 | $734,800.00 | $160,200.00 | $574,600.00 |
| 5/10/2021 | 26,293 | $68.58 | $1,803,173.94 | $421,213.86 | $1,381,960.08 |
| 5/11/2021 | 87,128 | $66.99 | $5,836,704.72 | $1,395,790.56 | $4,440,914.16 |
| 5/25/2021 | 10,000 | $80.82 | $808,200.00 | $160,200.00 | $648,000.00 |
| 6/7/2021 | 26,500 | $87.52 | $2,319,280.00 | $424,530.00 | $1,894,750.00 |
| 6/8/2021 | 978 | $90.05 | $88,068.90 | $15,667.56 | $72,401.34 |
| 6/9/2021 | 2,522 | $90.00 | $226,980.00 | $40,402.44 | $186,577.56 |
| 6/24/2021 | 9,605 | $95.30 | $915,356.50 | $153,872.10 | $761,484.40 |
| 6/25/2021 | 395 | $95 | $37,525 | $6,327.90 | $31,197.00 |
| 7/6/2021 | 10,000 | $90.42 | $904,200.00 | $160,200.00 | $744,000.00 |
| 8/5/2021 | 10,000 | $83.04 | $830,400.00 | $160,200.00 | $670,200.00 |
| 9/7/2021 | 10,000 | $74.40 | $744,000.00 | $160,200.00 | $583,800.00 |
| 10/5/2021 | 10,000 | $65.02 | $650,200.00 | $160,200.00 | $490,000.00 |
| 11/5/2021 | 10,000 | $49.40 | $494,000.00 | $160,200.00 | $333,800.00 |
| 12/6/2021 | 10,000 | $42.04 | $420,400.00 | $160,200.00 | $260,200.00 |
| 1/5/2022 | 10,000 | $44.71 | $447,100.00 | $160,200.00 | $286,900.00 |
| 2/7/2022 | 10,000 | $42.06 | $420,600.00 | $160,200.00 | $260,400.00 |
| 3/7/2022 | 10,000 | $33.20 | $332,000.00 | $160,200.00 | $171,800.00 |

| | | | | | |
|---|---|---|---|---|---|
| 4/5/2022 | 10,000 | $38.91 | $389,100.00 | $160,200.00 | $228,900.00 |
| **Totals** | **513,421** | | **$28,804,784.17** | **$8,225,004.42** | **$20,579,779.65** |

256. Defendant Seeto made the following sales of CareDx common stock between December 18, 2020, and March 21, 2022, while the price of the Company's stock was artificially inflated, earning approximately $9 million in proceeds, substantially more than what he would have earned had investors known the truth about CareDx's business operations. Prior to the Relevant Period, Defendant Seeto had not made any sales of CareDx common stock.

| Date | Shares | Avg. Price per Share | Proceeds | Proceeds at $16.02 per Share | Losses Avoided |
|---|---|---|---|---|---|
| 12/18/2020 | 8,363 | $68.01 | $568,767.63 | $133,975.26 | $434,792.37 |
| 3/1/2021 | 10,704 | $84.46 | $904,059.84 | $171,478.08 | $732,581.76 |
| 6/7/2021 | 9,973 | $90.01 | $897,669.73 | $159,767.46 | $737,902.27 |
| 6/8/2021 | 500 | $90.00 | $45,000.00 | $8,010.00 | $36,990.00 |
| 6/9/2021 | 16,718 | $90.01 | $1,504,787.18 | $267,822.36 | $1,236,964.82 |
| 6/24/2021 | 10,602 | $95.31 | $1,010,476.62 | $169,844.04 | $840,632.58 |
| 6/25/2021 | 9,210 | $95.15 | $876,331.50 | $147,544.20 | $728,787.30 |
| 6/28/2021 | 13,212 | $95.88 | $1,266,766.56 | $211,656.24 | $1,055,110.32 |
| 7/8/2021 | 5,994 | $85.74 | $513,925.56 | $96,023.88 | $417,901.68 |
| 8/27/2021 | 658 | $80.00 | $52,640.00 | $10,541.16 | $42,098.84 |
| 1/18/2022 | 1,719 | $40.07 | $68,880.33 | $27,538.38 | $41,341,95 |
| 1/19/2022 | 3,137 | $40.05 | $125,636.85 | $50,254.74 | $75,382.11 |
| 2/1/2022 | 814 | $42.13 | $34,293.82 | $13,040.28 | $21,253.54 |
| 2/2/2022 | 3,182 | $41.25 | $131,257.50 | $50,975.64 | $80,281.86 |
| 2/4/2022 | 4,988 | $40.34 | $201,215.92 | $79,907.76 | $121,308.16 |
| 2/9/2022 | 2,550 | $45.00 | $114,750.00 | $40,851.00 | $73,899.00 |
| 3/1/2022 | 3,153 | $38.62 | $121,768.86 | $50,511.06 | $71,257.80 |
| 3/21/2022 | 2,888 | $40.43 | $116,761.84 | $46,265.76 | $70,496.08 |
| **Totals** | **108,365** | | **$8,554,989.74** | **$1,736,007.30** | **$6,777,640.49** |

257. Defendant Snyderman made the following sales of CareDx common stock between May 27, 2021, and June 2, 2021, while the price of the Company's stock was artificially inflated, earning approximately $761,857 in proceeds, substantially more than what he would have earned had investors known the truth about CareDx's business operations. Prior to the

Relevant Period, Defendant Snyderman had not made any sales of CareDx common stock. In a "FY2020 Directors' Questionnaire" completed by Defendant Snyderman on February 1, 2021, Defendant Snyderman indicated that he did not have a Rule 10b5-1 trading plan in place. *See* CAREDX-WOOD-00001870. In addition, according to the respective Form 4s filed with the SEC in connection with the below trades, none were made as part of a 10b5-1 trading plan.

| Date | Shares | Avg. Price per Share | Proceeds | Proceeds at $16.02 per Share | Losses Avoided |
|---|---|---|---|---|---|
| 5/27/2021 | 1,966 | $81.01 | $159,265.66 | $31,495.32 | $127,770.34 |
| 5/28/2021 | 2,511 | $81.08 | $203,591.88 | $40,226.22 | $163,365.66 |
| 6/1/2021 | 2,512 | $77.30 | $194,177.60 | $40,242.25 | $153,935.36 |
| 6/2/2021 | 2,511 | $81.57 | $204,822.27 | $40,226.22 | $164,596.05 |
| **Totals** | **9,500** | | **$761,857.41** | **$152,190.01** | **$609,667.41** |

258. The shares sold by the Insider Selling Defendants during the Relevant Period were highly suspicious in both amount (based on the sheer dollar value of shares sold) and timing (made during a time period where the Individual Defendants were making materially false statements to investors and/or failing to disclose material information that they had a duty to disclose) and therefore support scienter. In particular, Defendants Maag, Hagstrom, Goldberg, Bickerstaff, and Snyderman all made large stock sales over the course of a few days in mid-2021 – just around the time period the Individual Defendants' illegal schemes began to unravel with increased scrutiny from regulators and government investigators. Defendant Seeto, meanwhile, sold nearly half of his Relevant Period sales proceeds in a single month, and at near all-time high prices. In other words, after the Individual Defendants' fraud had caused CareDx's stock price to reach its artificial height (roughly $90 per share), Defendant Seeto capitalized on the momentary spike – dumping thousands of shares on unknowing shareholders and enjoying millions in insider trading profits.

259. Moreover, the Insider Selling Defendants' sales were well timed to take advantage of the high prices the Company's stock reached in the first half of the Relevant Period, and, notably, nearly halted after April 2022, when the Olymbios Complaint publicly revealed the truth regarding the fraudulent scheme.

260. Accordingly, the Insider Selling Defendants were motivated to make materially false and misleading statements and conceal material adverse information from investors so that they could personally profit from the artificial inflation in the trading price of CareDx's common stock resulting from their false and misleading statements and omissions during the Relevant Period and before the truth was disclosed to the investing public.

## DAMAGES TO CAREDX

261. As a direct and proximate result of the Individual Defendants' misconduct, CareDx has expended and will continue to expend many millions of dollars.

262. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution or to satisfy a judgment associated with the Federal Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

263. Such expenditures will also include costs incurred in any internal investigation pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

264. As a direct and proximate result of the Individual Defendants' conduct, CareDx has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

265. Plaintiffs bring this action derivatively and for the benefit of CareDx to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of CareDx, insider trading, waste of corporate assets, unjust enrichment, and violations of Sections 14(a) and 20(a) of the Exchange Act.

266. CareDx is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

267. Plaintiffs are, and have been continuously at all relevant times, stockholders of CareDx. Plaintiffs will adequately and fairly represent the interests of CareDx in enforcing and prosecuting their rights, and, to that end, have retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

268. Plaintiffs incorporate by reference and re-allege each allegation stated above as if fully set forth herein.

269. A pre-suit demand on the Board of CareDx is futile and, therefore, excused. Pursuant to the Letter Agreement, the composition of the Board for purposes of evaluating demand futility is the Board that was in place as of September 21, 2022. At that time, the Board consisted of Defendants (***i***) Bickerstaff, (***ii***) Cohen, (***iii***) Colón, (***iv***) Cournoyer, (***v***) Goldberg, (***vi***) Hagstrom, (***vii***) Maag, (***viii***) Seeto, (***ix***) Valantine, and (***x***) Torres (the "Director Defendants"). Plaintiffs did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**A. A Majority of the Board Faces a Substantial Likelihood of Liability Due to the Issuance of Materially False and Misleading Statements**

270. As set forth herein, the Q1 2020 10-Q, the April 30, 2020 conference call, Form 8-K filed on January 21, 2021, the 2020 10-K, the press release issued on May 5, 2021, the May

5, 2021 conference call, the Q1 2021 10-Q, the press release issued on July 29, 2021, the Q2 2021 10-Q, the press release issued on October 28, 2021, the Q3 2021 10-Q, the 2021 10-K, February 24, 2022 conference call, and the Form 10-Q filed on May 5, 2022, among other disclosures issued by the Company, all contained materially false and misleading statements and failed to disclose that the Company was actively engaged in a fraudulent scheme that had subjected the Company to increased risk of regulatory penalties and scrutiny.

271. Moreover, the Director Defendants (other than Defendant Torres) signed and issued the 2020 10-K, which misleadingly stated that the Company believed it was in material compliance with a host of laws and regulations that the Company was, in fact, violating. By failing to disclose that the Company's practices had placed it at increased risk of regulatory scrutiny and action, the Individual Defendants, including the Director Defendants, actively concealed the fraudulent scheme and misled investors.

272. Furthermore, the Director Defendants signed and issued the 2021 10-K, which failed to disclose that ASPs were actually declining because Medicare – including Medicare Advantage plans – was increasingly denying reimbursement for CareDx's clearly unnecessary and fraudulently billed AlloSure tests, and because the Individual Defendants were quietly winding down the unsustainable RemoTraC scheme in the face of regulatory scrutiny.

273. In addition, the misconduct alleged herein relates to CareDx's core business operations. The testing services segment accounted for 87% of the Company's 2021 revenue. Within the testing segment, AlloSure and RemoTrac were the Company's most prominent tests.

274. In light of this, compliance with the applicable health care laws should have constituted a matter of paramount importance for CareDx and the Individual Defendants. The Board's failure to make proper and/or complete disclosures demonstrates, at the very least, a lack

of reasonable care. As a result, the Individual Defendants failed to fulfill their fiduciary duties to the Company, face a substantial likelihood of liability, and therefore demand upon them is futile.

**B. Additional Reasons that Demand Upon the Board is Futile**

275. Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme in which they engaged, knowingly or recklessly, to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

276. In abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director Defendants breached their fiduciary duties, faced a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

277. Director Defendants Seeto, Maag, Bickerstaff, Cohen, Colón, Cournoyer, Goldberg, and Hagstrom further face a substantial likelihood of liability because they signed and thus personally made the false and misleading statements in the 2020 10-K and the 2021 10-K. Defendants Torres further face a substantial likelihood of liability because he signed and thus personally made the false and misleading statements in the 2021 10-K.

278. Because of their positions as officers and/or board members, each of the Insider Selling Defendants (Defendants Bickerstaff, Colon, Goldberg, Hagstrom, Maag, Seeto, and Snyderman) possessed material non-public information. The Insider Selling Defendants

unlawfully misused this information and unjustly enriched themselves by selling their shares at artificially inflated prices. As a result, the Insider Selling Defendants' conduct harmed CareDx as the Insider Selling Defendants unjustly enriched themselves at the Company's expense. Accordingly, because this action asserts claims for unjust enrichment against the Insider Selling Defendants, and because the Insider Selling Defendants face a substantial likelihood of liability for these claims as well as for their breaches of fiduciary duty to the Company, the Insider Selling Defendants are incapable of considering a demand to commence and vigorously prosecute this action.

279. Defendant Seeto signed SOX certifications appended to the: 2020 10-K; Q1 2021 10-Q; and Q2 2021 10-Q. Defendant Seeto also personally made materially misleading statements during the earnings calls and conference described herein.

280. As trusted Company directors, the Director Defendants conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme and consciously disregarded their duties to protect corporate assets. For the above reasons, these Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

281. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the integrity of the Company's financial statements, the Company's compliance with laws and regulations, and the Company's accounting and financial reporting practices and system of internal controls. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and

internal controls, as they are charged with doing under the Audit Committee Charter, and allowed the Company to issue false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

282. In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including insider trading, breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Sections 14(a) and 20(a) of the Exchange Act. In further violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report violations of the Code of Conduct. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

283. CareDx has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for CareDx any part of the damages CareDx suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

284. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a

provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

285. The acts complained of herein constitute violations of fiduciary duties owed by CareDx's officers and directors, and these acts are incapable of ratification.

286. Thus, for all the reasons set forth above, all the Director Defendants, and, if not all of them, at least a majority of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**COUNT I**

**For Violations of Section 14(a) of the Exchange Act**
**Against the Individual Defendants**

287. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

288. The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

289. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of

such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

290. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

291. In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2021 Proxy Statement and 2022 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on the matters set forth for stockholder determination in the 2021 Proxy Statement and 2022 Proxy Statement, including, but not limited to, election of directors, ratification of an independent auditor, and the approval of executive compensation on an advisory basis.

292. The false and misleading elements of the 2021 Proxy Statement led to the re-elections of Bickerstaff, Colón, and Snyderman to serve until the 2024 annual meeting, and the 2022 Proxy Statement led to the re-elections of Cohen, Cournoyer, and Hagstrom to serve until the 2025 annual meeting, allowing them to continue breaching their fiduciary duties to CareDx.

293. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2021 Proxy Statement and 2021 Proxy Statement.

294. Plaintiffs, on behalf of CareDx, have no adequate remedy at law.

**COUNT II**

**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

295. Plaintiffs incorporate all the foregoing by reference.

296. The Individual Defendants, by virtue of their positions with CareDx and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of CareDx and officers and directors who made the false and misleading statements alleged herein within the meaning of Section 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause CareDx to engage in the illegal conduct and practices complained of herein.

297. Plaintiffs, on behalf of CareDx, have no adequate remedy at law.

**COUNT III**

**Breach of Fiduciary Duties**
**Against the Individual Defendants**

298. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

299. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of CareDx's business and affairs.

300. Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

301. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of CareDx.

302. In breach of their fiduciary duties, the Individual Defendants caused the Company to engage in the misconduct described herein.

303. Also in breach of their fiduciary duties, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements during the Relevant Period, that assured investors that CareDx was in regulatory compliance, yet failed to disclose major problems, which included that: (1) the Individual Defendants had engaged in a variety of improper and illegal schemes to inflate testing services revenue and demand, including pushing a surveillance protocol through inaccurate marketing materials, offering extravagant inducements or kickbacks to physicians and other providers, and improperly bundling expensive testing services with other blood tests as part of the RemoTraC service; (2) these practices, and others, subjected CareDx to an undisclosed risk of regulatory scrutiny and liability under the False Claims Act, the Anti-Kickback Statute, the Sunshine Act, and the Stark Law; (3) these practices rendered the Company's testing services revenue reported throughout the Relevant Period artificially inflated; and (4) as a result, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading.

304. The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

305. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard

for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

306. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

307. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, CareDx has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

308. Plaintiffs, on behalf of CareDx, have no adequate remedy at law.

**COUNT IV**

**Insider Trading**
**Against Defendants Bickerstaff, Colón, Goldberg,**
**Hagstrom, Maag, Seeto, and Snyderman**

309. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

310. When Defendants Goldberg, Seeto, Bickerstaff, Colón, Hagstrom, Maag, and Snyderman sold tens of millions of dollars' worth of stock and avoided losses of tens of millions of dollars, they were in possession of material, non-public information regarding the insiders' improper and illegal schemes to inflate testing services revenue, the public disclosure of which would have an adverse effect on the stock price. The revelation of this adverse information and the full truth concerning Defendants Seeto's and Maag's involvement in the scheme would destroy millions in market capitalization when revealed to the market.

311. The foregoing information was proprietary, material, adverse, and non-public information regarding the Company's operations known only by CareDx insiders. The information which formed the basis of the sales of stock made by Defendants Goldberg, Seeto, Bickerstaff, Colón, Hagstrom, Maag, and Snyderman was the type of information upon which they were specifically barred from trading. This information was a proprietary asset belonging to CareDx, which was usurped for the benefit of Defendants Goldberg, Seeto, Bickerstaff, Colón, Hagstrom, Maag, and Snyderman and to the detriment of the Company.

312. The use of this information by Defendants Goldberg, Seeto, Bickerstaff, Colón, Hagstrom, Maag, and Snyderman was a breach of their fiduciary duty of loyalty. Their insider sales of stock during the Relevant Period were predicated upon their possession of material, adverse, non-public information to which they had access as CareDx insiders.

313. Plaintiffs, on behalf of CareDx, have no adequate remedy at law.

**COUNT V**

**Unjust Enrichment**
**Against the Individual Defendants**

314. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

315. By their wrongful acts, violations of law, false and misleading statements, and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense and to the detriment of CareDx.

316. The Individual Defendants either benefitted financially from the improper conduct, received unjust compensation tied to the false and misleading statements, received bonuses, stock options, or similar compensation from CareDx tied to the performance or artificially inflated valuation of CareDx, or received compensation that was unjust in light of the

Individual Defendants' bad faith conduct, or sold stock at artificially inflated prices during the Relevant Period.

317. Under the circumstances it would be unjust and inequitable for the Individual Defendants to retain their ill-gotten gains.

318. Plaintiffs, on behalf of CareDx, have no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

(a) Declaring that Plaintiffs may maintain this action on behalf of CareDx, and that Plaintiffs are adequate representatives of the Company;

(b) Declaring that the Individual Defendants have breached their fiduciary duties to CareDx;

(c) Declaring that the Individual Defendants violated Sections 14(a) and 20(a) of the Exchange Act;

(d) Declaring that the Individual Defendants were unjustly enriched;

(e) Determining and awarding to CareDx the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

(f) Directing CareDx and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and protect CareDx and its stockholders from a repeat of the damaging events described herein;

(g) Awarding CareDx restitution from the Individual Defendants;

(h) Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(i) Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: February 26, 2025

Respectfully Submitted,

**BRAGAR EAGEL & SQUIRE, P.C.**

/s/ *Melissa A. Fortunato*
Melissa A. Fortunato (SBN 319767)
Marion C. Passmore
580 California Street, Suite 1200
San Francisco, CA 94104
Telephone: (415) 568-2124
Facsimile: (212) 214-0506
Email: fortunato@bespc.com
passmore@bespc.com

**LEVI & KORSINSKY, LLP**
Correy A. Suk (*pro hac vice* forthcoming)
Gregory M. Nespole (*pro hac vice* forthcoming)
Daniel Tepper (*pro hac vice* forthcoming)
33 Whitehall Street, 17th Floor
New York, New York 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-1294
Email: csuk@zlk.com
gnespole@zlk.com
dtepper@zlk.com

Adam M. Apton (SBN 316506)
1160 Battery Street East, Suite 100 - #3425
San Francisco, CA 94111
Telephone: (415) 373-1671
Facsimile: (415) 484-1294
Email: aapton@zlk.com

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen (SBN 219683)
355 South Grand Avenue, Suite 2450

Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Erica L. Stone (*pro hac vice forthcoming*)
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: estone@rosenlegal.com

*Counsel to Plaintiffs*

Docusign Envelope ID: 9C0951E0-CFAD-4DD0-AD97-E1418C39DE4E


# VERIFICATION

I, Jeffrey Edelman, under penalties of perjury, hereby do declare that I am a plaintiff in the foregoing complaint, that I have read the complaint, and that the facts therein are true to my own knowledge, except to matters stated therein to be alleged upon information and belief, and as to thosematters, I believe them to be true and correct to the best of my knowledge, information, and belief.

Date: February 25, 2025

DocuSigned by:

2187147C60D6497...

Jeffrey Edelman

**VERIFICATION**

I, Jaysen Stevenson, am a plaintiff in this action. I have reviewed the allegations made in the Verified Stockholder Derivative Complaint, know the contents thereof, and authorize its filing. As to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/24/2025

DocuSigned by:
A24AA3CE368D449...
Jaysen Stevenson

# VERIFICATION

I, Christian Jacobsen, declare that I have reviewed the Verified Stockholder Derivative Complaint ("Complaint") prepared on behalf of CareDx, Inc., and authorize its filing. I have reviewed the allegations made in the Complaint, and as to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and, for that reason, believe them to be true. I further declare that I am a current holder of CareDx, Inc. stock and have continuously held CareDx, Inc. stock from the time of the wrongdoing alleged herein until the present. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 26 day of February 2025.

Christian Jacobsen (Feb 26, 2025 09:13 MST)

Christian Jacobsen